837 P.2d 862

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**David L. GARCIA, Defendant–Appellant.**

No. 19806.

Supreme Court of New Mexico.

Aug. 10, 1992.

Sammy J. Quintana, Chief Public Defender, Susan Roth, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

Tom Udall, Atty. Gen., Max Shepherd, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

MONTGOMERY, Justice.

According to a leading authority on the law of criminal homicide in New Mexico,

No New Mexico case reviewing a deliberate intention first degree murder conviction has ever held that the evidence did not support a deliberate murder but instead supported no more than a nondeliberate or impulsive second degree murder.

Leo M. Romero, *A Critique of the Willful, Deliberate, and Premeditated Formula for Distinguishing Between First and Second Degree Murder in New Mexico,* 18 N.M.L.Rev. 73, 84 (1988).

This case fills that gap.

### I.

David Garcia was convicted of first degree murder by the District Court of Curry County on January 30, 1991. The conviction arose out of the stabbing death of Ray

Gutierrez on April 27, 1990, in Clovis, New Mexico.

Garcia and Gutierrez apparently had been friends or acquaintances for some time before April 27, 1990. Around noon that day, Garcia, Gutierrez, and two other friends purchased some beer and whiskey and went to drink it at the house of Julian Hidalgo, where several other people had gathered and were having a party. Garcia had been drinking beer throughout the morning and the night before. The two friends who accompanied Garcia and Gutierrez were Clara Pelland, Gutierrez's girlfriend, and Maria Delgado.

After the four arrived at Hidalgo's house, they went into the back yard, and Garcia and Gutierrez began arguing. The argument concerned an incident that had occurred about a month earlier, when Garcia had kicked Pelland. Apparently, Gutierrez was still angry about the incident; at any rate, Pelland had remarked earlier in the day that there was likely to be trouble between Garcia and Gutierrez.

In Hidalgo's back yard, Garcia and Gutierrez argued for a while, then appeared to make up, then resumed arguing. According to Pelland's testimony at the trial, Delgado started the second argument and told the two men that they should "take it [their argument] to the street." At this point, Pelland heard Garcia say, "Remove Ray away from me or you're not going to be seeing him for the rest of the day." Garcia and Gutierrez apparently made up a second time and went to the corner of the back yard. Pelland testified that about five minutes later she realized that Garcia and Gutierrez were no longer in the back yard. When she asked where the two men had gone, Delgado told her they had gone to the front yard.

Pelland testified that she then tried to go to the front yard, but that a man blocked her way. She struggled with him for five or ten minutes before she finally got to the front yard. When she arrived in the front yard, she saw Garcia jabbing Gutierrez in the chest with a knife, and she saw Gutierrez fall down. Gutierrez's face was "all sliced up." She grabbed Gutierrez and

shouted at Garcia, "Look what you did to my boyfriend." Garcia replied, "I'm going to mess you up like I messed up your boyfriend. I'll be seeing you soon." Pelland replied, "Come on, I'm right here. Go for it." Garcia responded, "No, your day will be coming soon."

Another witness at the trial, ten-year-old Chloe Goode, testified that when she first saw Garcia and Gutierrez, they were shaking hands in the back yard. Later, she saw them arguing and punching each other in the front yard. She said she saw Garcia grab Gutierrez and shove him against the wall. She testified that she only saw Garcia hitting Gutierrez; she did not see the actual stabbing.

The stabbing occurred at approximately 3:30 p.m. on April 27. Pelland testified that she saw Garcia drink at least ten beers and three shots of whiskey that afternoon.

After the stabbing, Officer Reeves arrived to investigate the incident. He determined that Garcia was a suspect and began to search for him. Officer Reeves went to a house on Pinon Street and asked if anyone there had seen Garcia. The people at the house said they had not seen him. However, Officer Reeves later realized, he testified, that one of the men who denied having seen Garcia was Garcia himself.

Approximately seven hours after the stabbing, at about 10:30 p.m., Officer Miller received a call that Garcia was at his parents' home and that he was voluntarily turning himself in. When Officer Miller arrived at the residence, he told Garcia to come out of the house. Garcia then stepped outside and said, "I did it. I did it. I'm not ashamed to admit it. I told my brother I did him and I'd do him again."

On June 8, 1990, the State charged Garcia with an open count of murder. Before trial, defense counsel moved for a forensic examination to evaluate Garcia's mental condition. The court granted the motion and set the case for trial. Then, two days before the trial was to begin, defense counsel moved for a continuance so that a neurological evaluation could be performed on Garcia. The trial court denied the motion and the case proceeded to trial.

At the close of the State's case, Garcia moved for a directed verdict, arguing that the State had not proved beyond a reasonable doubt that Garcia had the specific intent to commit first degree murder. The court denied the motion. The court then instructed the jury on first degree murder, second degree murder, voluntary manslaughter, and battery. The court also instructed the jury on sufficient provocation and inability to form intent because of intoxication. The jury found Garcia guilty of first degree murder, and he was sentenced to mandatory life imprisonment.[1]

Garcia raises two arguments on appeal. First, he asserts that there was insufficient evidence to support his conviction of first degree murder and that the trial court erred in denying his motion for a directed verdict. Second, he argues that the trial court, in denying his motion for a continuance for a neurological evaluation, deprived him of his fifth amendment right to present a defense.

We agree that the evidence was not sufficient to permit the jury to find that Garcia was guilty of first degree murder. There was no evidence enabling the jury to find, beyond a reasonable doubt, that defendant had the requisite state of mind—a "willful, deliberate and premeditated" intention to kill Gutierrez—to support a conviction of first degree murder. This holding makes it unnecessary to consider Garcia's second argument on appeal. That argument asserts that the requested neurological evaluation would have tended to establish that Garcia was incapable of forming the specific intent to commit first degree murder. See State v. Privett, 104 N.M. 79, 80, 717 P.2d 55, 56 (1986) (specific, deliberate intent to kill is an essential element of first degree murder). Since we hold that the evidence was insufficient to permit a finding of the requisite specific intent, and since Garcia's requested neuro-

logical evaluation would have been irrelevant to the charge of second degree murder, we need not reach the issue of whether the court erred in refusing to grant Garcia's motion for a continuance. See State v. Beach, 102 N.M. 642, 644–45, 699 P.2d 115, 117–18 (1985) (second degree murder is not a specific intent crime; diminished capacity is not a defense to charge of second degree murder).

For the following reasons, we reverse the judgment below and remand for a new trial on the offenses of second degree murder and voluntary manslaughter.

## II.

In New Mexico, first degree murder is defined as "any kind of willful, deliberate and premeditated killing." NMSA 1978, § 30–2–1(A)(1) (Repl.Pamp.1984).[2] The courts of this state have construed this definition to mean "a killing with the deliberate intention to take away the life of another." Romero, supra at 83 (citing, inter alia, State v. Valenzuela, 90 N.M. 25, 30, 559 P.2d 402, 407 (1976); State v. Vigil, 87 N.M. 345, 350, 533 P.2d 578, 583 (1975); State v. Aragon, 85 N.M. 401, 403, 512 P.2d 974, 976 (Ct.App.1973)). The statute itself does not define "deliberate intention." However, our Uniform Jury Instructions for Criminal Cases (UJI Crim.) define "deliberate" as

> arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

---

1. Under NMSA 1978, Section 31–18–14 (punishment for capital felony (first degree murder) is life imprisonment or death) and under Section 31–21–10(A) (life imprisonment entails minimum incarceration of thirty years before parole eligibility).

2. The statute also defines first degree murder as a killing in the commission of or attempt to commit any felony (felony murder), or by any act greatly dangerous to the lives of others (depraved mind murder). Subsections 30–2–1(A)(2) & (3). This case does not involve either of these two latter types of murder.

SCRA 1986, 14–201.[3] The court gave this instruction in this case.

Although our courts have agreed on the meaning of first degree murder, and although this Court has promulgated a uniform jury instruction defining in some detail the meaning of "deliberate," we (the appellate courts) probably have not been especially helpful in distinguishing first degree murder from second degree murder. *See Romero, supra* at 73, 77, 84–86. As Dean Romero suggests, "Without guidance with respect to the types of evidence that will support a deliberate murder, virtually all intentional killings will result in jury instructions on first degree murder and the jury will be left to apply its own conception of what deliberate intention means." *Id.* at 86.

There is no question that the distinction between first degree murder and second degree murder is of great importance to the administration of criminal justice in New Mexico—to say nothing of its importance to a defendant who stands accused, as Garcia did, under an "open" charge of murder. The distinction differentiates between those killings that are the most heinous and reprehensible, and therefore deserving of the most serious punishment under this state's law, and those which, although "intentional" in some sense, lack the gravity associated with first degree murders. Under our law, first degree murder is a capital felony, which carries a penalty of death [4] or mandatory life imprisonment,[5] whereas second degree murder is a second degree felony, which carries a penalty of nine years imprisonment.[6] Clearly, when the legislature prescribed such serious penalties for a "willful, deliberate and premeditated killing," it did not mean to lump within this classification all other killings, even those which may in some sense be intentional but which lack the characteristics of deliberation and premeditation.

The statute defining second degree murder does not use the words "intent" or "intentional," but it has been construed by our Court of Appeals to include intentional killings. *State v. Johnson,* 103 N.M. 364, 370, 707 P.2d 1174, 1180 (Ct.App.), *cert. quashed,* 103 N.M. 344, 707 P.2d 552 (1985). Second degree murder is defined as a killing with knowledge that the killer's act or acts "create a strong probability of death or great bodily harm" to the victim or another. NMSA 1978, § 30–2–1(B) (Repl.Pamp.1984). As the court said in *Johnson,* "an intentional killing would always include these elements"—*i.e.,* the elements of killing with knowledge of the requisite probability. 103 N.M. at 370, 707 P.2d at 1180.

■■■ The court's analysis in *Johnson* perhaps does not go far enough: Even though an intentional killing includes the element of knowledge of a strong probability of death or great bodily harm, the con-

---

**3.** In *State v. Ortega,* 112 N.M. 554, 567 n. 13, 817 P.2d 1196, 1209 n. 13 (1991), we expressed some reservations about the elaborateness with which this instruction enlarges upon the statutory phrase, "willful, deliberate and premeditated." However, this case presents no issue as to the propriety of the instruction; it is one of our prescribed uniform jury instructions, was given in this case without objection, and in any event is the law of the case on this appeal. We therefore review the sufficiency of the evidence offered to prove deliberation as defined in the instruction.

**4.** The death penalty can be imposed when the sentencing jury unanimously finds that one or more of several aggravating factors were present and unanimously agrees to impose a death sentence. *See* §§ 31–20A–3, –5 (including, among aggravating factors, victim's status as police officer acting in discharge of official

duty, commission of murder while committing or attempting to commit certain serious felonies, commission of murder while attempting to escape incarceration, commission of murder for hire, and murder of a witness to a crime for purpose of preventing report of the crime).

**5.** As indicated in footnote 1, life imprisonment entails a mandatory term of thirty years imprisonment without possibility of parole, Section 31–21–10A, or reduction through "good time" credits. *See Martinez v. State,* 108 N.M. 382, 383, 772 P.2d 1305, 1306, *cert. denied,* 493 U.S. 833, 110 S.Ct. 107, 107 L.Ed.2d 70 (1989).

**6.** *See* §§ 30–2–1(B), 31–18–15(A)(2). This penalty is the basic sentence, which is subject to aggravation or mitigation by as much as one-third in the trial judge's discretion under Section 31–18–15.1 and against which good time credits can be applied under Section 33–2–34.

verse is not necessarily true; a killing with knowledge of the requisite probability does not necessarily include an intentional killing. The legislature could have intended to exclude from second degree murder a killing in which there was an actual intent to kill as opposed to a killing with knowledge of the likelihood of death or great bodily harm. However, the statutory definition of murder provides: "Murder in the second degree is a lesser included offense of the crime of murder in the first degree." Section 30–2–1(B). A lesser included offense is one that includes some, but not all, of the elements of a greater offense and that does not have any element not included in the greater offense, so that it is impossible to commit the greater offense without necessarily committing the lesser offense. *State v. Garcia*, 100 N.M. 120, 125, 666 P.2d 1267, 1272 (Ct.App.), *cert. denied*, 100 N.M. 192, 668 P.2d 308 (1983). When the legislature amended the Criminal Code in 1980 to redefine the offenses of first and second degree murder as set out in Section 30–2–1, it did so against the background of cases holding that intentional killings were embraced within second degree murder.[7] The legislature also had, as background, the benefit of our uniform jury instruction defining "deliberate intention" in the same terms, verbatim, as are now contained in UJI 14–201. *See* NMSA 1953, 2d Repl.Vol. 6 (1972), UJI Crim. 2.00 (Supp.1975). We think it reasonable, therefore, to conclude that the legislature intended to exclude from second degree murder the element of deliberation but not to exclude otherwise intentional killings from that crime.

We thus approve the Court of Appeals' construction of the second degree murder statute in *Johnson*. It follows that under New Mexico's statutory scheme murder

consists of two categories of intentional killings: those that are willful, deliberate, and premeditated; and those that are committed without such deliberation and premeditation but with knowledge that the killer's acts create a strong probability of death or great bodily harm. Included within the second category is the kind of killing expressly contemplated by UJI Crim. 14–201 as *not* a deliberate murder—namely, a killing that, even though intentional, is committed on "[a] mere unconsidered and rash impulse," *i.e.*, a rash or impulsive killing.

### III.

Was Garcia's killing of Gutierrez deliberate and premeditated, or was it only rash and impulsive? There is no question that the jury could infer from the nature of the act itself—stabbing the victim in the chest after several quarrels—that the killing was willful—*i.e.*, intentional. But was there evidence from which the jury could infer beyond a reasonable doubt that Garcia deliberated and premeditated before he stabbed Gutierrez?

### A.

■ We might answer this question, as have so many cases before, by saying that on review of a defendant's motion for a directed verdict we view the evidence in the light most favorable to the State, resolving all conflicts and indulging all permissible inferences in favor of a verdict of conviction. *See, e.g., State v. Robinson*, 94 N.M. 693, 696, 616 P.2d 406, 409 (1980); *State v. Vigil*, 87 N.M. 345, 349, 533 P.2d 578, 582 (1975). Many other cases of both this Court and the Court of Appeals have expressed a similar standard of review;[8] but

---

7. *State v. Smith*, 26 N.M. 483, 493, 194 P. 869, 872–73 (1921); *see also State v. Aragon*, 85 N.M. 401, 403, 512 P.2d 974, 976 (Ct.App.1973) (second degree murder is murder with premeditation or malice aforethought, but without deliberation); *State v. Sanchez*, 27 N.M. 62, 64, 196 P. 175, 175 (1921) (same).

8. *E.g., State v. Manus*, 93 N.M. 95, 98, 597 P.2d 280, 283 (1979) ("In determining whether substantial evidence was presented to support charges, an appellate court must view the evi-

dence in the light most favorable to the State and indulge all reasonable inferences which support the conviction."); *State v. Lankford*, 92 N.M. 1, 2, 582 P.2d 378, 379 (1978) ("In determining whether the evidence supports a criminal charge or an essential element thereof, the appeals court must view the evidence in a light most favorable to the state, resolving all conflicts therein and indulging all permissible inferences therefrom in favor of a verdict of conviction."); *State v. Romero*, 111 N.M. 99, 101, 801

few have openly avowed, as part of that standard of review, that the evidence must be evaluated to determine whether the jury could rationally reach its verdict *beyond a reasonable doubt.*

One exception is *State v. Sutphin,* 107 N.M. 126, 753 P.2d 1314 (1988), in which we said:

An appellate court does not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence. Instead, the test to determine the sufficiency of evidence in New Mexico, which is the same as enunciated in *Jackson,* is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt *beyond a reasonable doubt* with respect to *every element* essential to a conviction.

*Id.* at 130–31, 753 P.2d at 1318–19 (emphasis added) (citing *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

In *Jackson,* the United States Supreme Court observed:

[A] properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt * * *. Under *Winship,* which established proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process, it follows that when such a conviction occurs in a state trial, it cannot constitutionally stand.

 *   *   *   *   *   *

After *Winship* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. * * * [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier

of fact could have found the essential elements of the crime beyond a reasonable doubt.

443 U.S. at 317–19, 99 S.Ct. at 2788–89 (citing *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (due process requires proof beyond a reasonable doubt of every fact necessary to constitute crime with which accused is charged)).

Thus, under the standard laid down in *Jackson* and applied in cases like *Sutphin,* we perceive it to be an appellate court's duty on review of a criminal conviction to determine whether *any* rational jury could have found each element of the crime to be established beyond a reasonable doubt. This does not involve substituting the appellate court's judgment for that of the jury in deciding the reasonable-doubt question, but it does require appellate court scrutiny of the evidence and supervision of the jury's fact-finding function to ensure that, indeed, a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction.

### B.

▮ In this case, we believe that the evidence was not only insufficient to allow a rational jury to find the essential element of deliberation in Garcia's stabbing of Gutierrez; it was altogether lacking to serve as a basis for any such inference. There was *no* evidence to support the jury's conclusion that, as contemplated by the trial court's instruction, Garcia decided to stab Gutierrez as a result of careful thought; that he weighed the considerations for and against his proposed course of action; and that he weighed and considered the question of killing and his reasons for and against this choice. On the contrary, the *only* evidence before the jury, direct or circumstantial, as to his state of mind before the killing was that he quarreled with Gutierrez, and then appeared to make up, in the back yard; that he then quarreled again in the front yard, trading punches

P.2d 681, 683 (Ct.App.) ("The question presented by a motion for directed verdict is whether there is substantial evidence supporting the charge."), *cert. denied,* 111 N.M. 77, 801 P.2d 659

(1990). None of these cases mentions the requirement of proof beyond a reasonable doubt in connection with the court's substantial evidence review.

with and shoving Gutierrez against a wall; and that he then cut his victim in the face and stabbed him in the chest. This evidence is consistent with a rash and impulsive killing; indeed, we do not hesitate to say that the jury properly found, beyond a reasonable doubt, that Garcia stabbed Gutierrez intending to kill him, or at least with knowledge that his acts created a strong probability of death or great bodily harm. But there was no evidence from which the jury could infer that, either in the back yard, while going to the front yard, or after they reached the front yard, Garcia formed the "deliberate," as defined by the court's instructions, intention to kill.

Hence, we disagree with the State's assertion that "Clearly the fact that defendant went to the front yard to settle his dispute with Ray Gutierrez plus the fact that once in the front yard he attacked an unarmed Ray Gutierrez * * * with a knife is evidence of a plan or design from which the jury could infer that defendant formed a deliberate intent to kill Ray Gutierrez." Relying on two New Mexico cases—*State v. Blea*, 101 N.M. 323, 681 P.2d 1100 (1984), and *State v. Lucero*, 88 N.M. 441, 541 P.2d 430 (1975)—the State argues that Garcia had sufficient time to form the deliberate intent to kill Gutierrez. Additionally, the State contends that Garcia's actions after the stabbing provide evidence of a deliberate intent to kill.

■ We do not dispute the State's contention that Garcia had sufficient time to form a deliberate intention to kill. As both *Blea* and *Lucero* recognize, a defendant can form the requisite intent for first degree murder in a short period of time. *Blea*, 101 N.M. at 326, 681 P.2d at 1103; *Lucero*, 88 N.M. at 443, 541 P.2d at 432. But what is a "short period of time"? A second or two? If so, then it is hard to see any principled distinction between an impulsive killing and one that is deliberate and premeditated. Garcia certainly could have formed a deliberate intent during the ten to fifteen minutes while going from the back yard to the front yard, but nothing in the evidence enabled the jury to infer that this is when he formed the requisite delib-

erate intent, or that he *ever* formed such an intent.

Garcia's comment in the back yard, "Remove Ray away from me or you're not going to be seeing him for the rest of the day," does not provide the foundation for such an inference. Although it suggests that Garcia intended to fight Gutierrez, it certainly does not indicate an intent to kill. Similarly, Garcia's comments after the stabbing are not probative of an intent to kill. His threatening remarks to Pelland in the front yard—that he was going to "mess her up" like he messed up Gutierrez—do not indicate whether he had intended to kill Gutierrez. The same is true with regard to his actions in concealing his identity from Officer Reeves at the Pinon Street house: The jury could easily infer that Garcia, having stabbed and killed Gutierrez, desired to conceal his identity; but that understandable desire did not give rise to any inference as to his state of mind *before* the stabbing.

■ Garcia's voluntary confession to Officer Miller, "I told my brother I did him and I'd do him again," is probably the State's strongest evidence of a deliberate intent to kill. It provides direct evidence of Garcia's desire to kill Gutierrez again if given a second chance. That confession, however, while expressing an intent to kill Gutierrez again if given the opportunity, does not show that Garcia deliberated and intended to kill his victim before the stabbing. All we know is that the parties argued in the back yard and decided to "take it to the street," and that ten to fifteen minutes later Garcia stabbed Gutierrez. From this evidence, the jury could infer with equal probability that Garcia did or did not form an intent to kill Gutierrez before he actually did so. However, "[e]vidence equally consistent with two hypotheses tends to prove neither." *Herron v. State*, 111 N.M. 357, 362, 805 P.2d 624, 629 (1991). In other words, evidence equally consistent with two inferences does not, without more, provide a basis for adopting either one—especially beyond a reasonable doubt.

Accordingly, Garcia's conviction for first degree murder is reversed.

IT IS SO ORDERED.

RANSON, C.J., and FRANCHINI, J., concur.

## OPINION ON REHEARING

The foregoing opinion (except for the last paragraph of Part I and the last sentence of Part III) was filed on June 15, 1992. Included in the opinion as filed (but not included in the foregoing opinion) was Part IV, in which we briefly dealt with an issue not discussed by the parties in their briefs: the disposition of the case after reversal of the first degree murder conviction and on remand to the trial court. Based on our independent research; on our view that the evidence adduced at trial, while not sufficient to support a first degree murder conviction, *was* sufficient to support a conviction of second degree murder; and on the jury's finding, which was permissible under the evidence, that Garcia either intended to kill Gutierrez or acted with knowledge of a strong probability that Gutierrez would suffer death or great bodily harm, we directed in Part IV that the case be remanded for entry of a judgment of conviction of second degree murder and resentencing as provided by law. *See, e.g., Dickenson v. Israel*, 482 F.Supp. 1223, 1225–26 (E.D.Wis. 1980) (court reversing for insufficient evidence to support one element of offense may order entry of judgment on adequately proved lesser included offense), *aff'd*, 644 F.2d 308, 309 (7th Cir.1981) (adopting district court opinion); *Ex parte Edwards*, 452 So.2d 508, 509–10 (Ala.1984) (same).

Thereafter, Garcia moved for rehearing on the issue of the appropriate disposition following reversal, contending that he should be retried on the offenses of second degree murder and voluntary manslaughter and be given an opportunity to prove to a jury that he was guilty, at most, of voluntary manslaughter, based on evidence that he was sufficiently provoked to justify the killing under our statute defining voluntary manslaughter. *See* NMSA 1978, § 30–2–3(A) (Repl.Pamp.1984) ("Voluntary manslaughter consists of manslaughter committed upon a sudden quarrel or in the heat of passion."); *see also* SCRA 1986, 14–220, –222 (jury instructions on voluntary manslaughter and sufficient provocation). The State did not file a motion for rehearing but did notify us of its concurrence in Garcia's motion.

Having reviewed Garcia's motion and his brief in support thereof, and in light of the State's concurrence in the motion, we are persuaded that the interests of justice will be better served in this case by remanding for a new trial on the offenses of second degree murder and voluntary manslaughter. (Of course, retrial on first degree murder is precluded by double jeopardy. *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1977)).

The cause is therefore remanded to the district court with instructions to proceed in conformity with this opinion.

IT IS SO ORDERED.

RANSOM, C.J., and FRANCHINI, J., concur.