This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                              **NO. 30,793**

**TERRY JOHNSON,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Neil C. Candelaria, District Judge**

Gary K. King, Attorney General
Olga Serafimova, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Acting Chief Public Defender
Kimberly Chavez Cook, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**VANZI, Judge.**

Defendant Terry Johnson appeals his conviction from a verdict finding him guilty of second degree murder. Defendant raises three issues on appeal: (1) the district court erred in instructing the jury on second degree murder, (2) the district court erred in admitting third-party testimony of an eyewitness's out-of-court identifications of Defendant, and (3) there was insufficient evidence to sustain his conviction. We affirm.

**BACKGROUND**

Because the parties are familiar with the factual and procedural background and because this is not a formal opinion, we do not provide detailed background information. We address the facts and procedure as necessary in the context of our analysis. We begin with whether the district court erred in admitting Margaret Mendoza's testimony concerning her daughter Marisa Mendoza's out-of-court statements of identification and then turn to Defendant's remaining arguments.

**Third-Party Identification Testimony**

Defendant argues that the district court erred in allowing Margaret to testify regarding Marisa's out-of-court statements of identification. At trial, the State argued that it needed Margaret's testimony "to explain to the jury why she didn't come forward with this information originally to the police." The district court admitted the statements as non-hearsay, both as a prior identification and as going to mother's state of mind. An appellate court reviews "the admission of evidence under an abuse of

discretion standard and will not reverse in the absence of a clear abuse." *State v. Sarracino*, 1998-NMSC-022, ¶ 20, 125 N.M. 511, 964 P.2d 72. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Rojo*, 1999-NMSC-001, ¶ 41, 126 N.M. 438, 971 P.2d 829 (internal quotation marks and citation omitted). "An appellate court should be wary of substituting its judgment for that of the trial court." *State v. Alberico*, 116 N.M. 156, 170, 861 P.2d 192, 206 (1993).

The parties agree that out-of-court statements of identification are non-hearsay under Rule 11-801(D)(1)(c) NMRA. The parties also do not dispute that admission of an out-of-court statement may nevertheless be subject to Rule 11-403 NMRA. Rule 11-403 provides that a court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice or is needlessly cumulative. Here, Defendant argues that Margaret's "bolstering" testimony of Marisa's in-court recollective statements is cumulative and prejudicial and was therefore inadmissible. Applying the standard we must, we disagree.

With respect to the identification of Defendant, Marisa testified as follows. On the day of the shooting, Marisa was in her family's apartment playing with her younger brother. She saw four men in dark clothing gathering in the courtyard and

taking hiding positions. She thought three of the men had guns. Marisa saw Lamarrus Washington (Victim) walk through the breezeway on his way toward Miranda Moore's apartment and heard him knock on her door for a while. She then saw the dark-clothed men jump out and shoot Victim. Although there was some apparent confusion about her vantage point, Marisa was clear that she saw the shooting. At trial, Marisa was unable to identify Defendant in the courtroom.

Miranda used to date Defendant and was pregnant with his child at the time of the shooting, but they had been broken up for a few weeks. Marisa testified that she recognized one of the dark-clothed men as Miranda's "husband," who she had seen visit Miranda but had never actually met. Marisa testified that Defendant came up to her at the bedroom window before the shooting and offered her five dollars to keep quiet. After the shooting, Marisa told her mother who did it and said only that "it was the neighbor's boyfriend." Marisa's mother did not believe her and told Marisa, "No. It was not him."

Marisa's mother, Margaret, was at home with her mother and three of her four children on the evening of the shooting. She also identified Defendant as Miranda's boyfriend and said that he stayed at Miranda's apartment "once in a while." Margaret testified that after the shooting, Marisa was scared, frightened, and shaking and repeatedly "said that it was the neighbor's boyfriend." When the police later arrived, Margaret did not tell the officer that Marisa told her that the shooter was the

4

neighbor's boyfriend. Two or three days after the shooting, Margaret was watching the news with three of her children, including Marisa. She testified that Defendant's picture flashed on the news and, at that point, Marisa said, "I told you. I told you it was—I told you it was him."

Defendant contends that Margaret's testimony was cumulative and served only to bolster Marisa's unreliable identification and therefore should have been excluded. We are not persuaded that Margaret's testimony amounted to improper bolstering of Marisa's identification testimony. Bolstering occurs when the testimony is improperly used by a party to add credence or weight to some earlier unimpeached piece of evidence offered by the same party, and the testimony "encroaches . . . upon the jury's function as arbiter of the witnesses' credibility." *Alberico*, 116 N.M. at 175-76, 861 P.2d at 211-12. In this case, the "bolstering" testimony only confirmed the fact of the identification. It went into no particulars of such identification or the means by which Marisa reached her conclusion. Beyond the fact that Margaret testified that Marisa said that the shooter was the neighbor's boyfriend and, later, that it was Defendant's picture on the news, there was nothing to shore up the reliability or probative worth of Marisa's identification. Accordingly, we conclude that Margaret's identification testimony was not offered with the sole purpose to increase the credibility of Marisa's testimony. Instead, her testimony merely corroborated Marisa's identification

5

testimony. It was an independent piece of trial evidence that the jury was free to accept or reject.

We also note that, in addition to admitting the non-hearsay testimony as a prior identification, the district court admitted Margaret's statements as going to her state of mind. Margaret did not believe Marisa when Marisa first told her that she saw Defendant and that he was the shooter. This was further supported by the fact that Margaret did not tell the police, who interviewed her shortly after the shooting, that Marisa said it was the neighbor's boyfriend. Thus, it is entirely conceivable that Margaret's testimony was not used to bolster Marisa's testimony identifying Defendant, but rather to explain why she did not believe Marisa until Marisa pointed him out on the television a few days later.

Defendant essentially relies on two cases to support his argument that the district court erred in allowing Margaret's "bolstering statements of identity." Neither is applicable here. First, in *People v. Buie*, 658 N.E.2d 192, 197 (N.Y. 1995), the New York court noted that non-expert evidence containing a testifying eyewitness's account of a crime is generally inadmissible. Importantly, under New York's rules of evidence, such testimony of third-party identification is hearsay, not falling within any exception. *Id.* The New Mexico rules of evidence, on the other hand, provide that statements of identification are exempt from the hearsay rules. Rule 11-801(D)(1)(c). Accordingly, Defendant's reliance on *Buie* is misplaced.

6

Defendant also relies on *Alberico*, 116 N.M. at 175, 861 P.2d at 211, for the proposition that a third-party witness may not testify as to the identity of the alleged perpetrator of the crime. In *Alberico*, our Supreme Court concluded that allowing identification testimony by an expert encroaches too far upon the jury's function as arbiter of the witnesses' credibility. *Id.* In that case, a psychologist independently evaluated a victim's allegations of sexual abuse by cross checking her symptoms; however, there appeared to be no similar verification for identifying the alleged abuser. *Id.* at 175-76, 861 P.2d at 211. Thus, the psychologist had to rely in large part upon the victim's story, and "allowing the psychologist to testify as to the identity of the accused serve[d] only to repeat what the complainant told the examining expert and thus bolster her credibility." *Id.* That is not the situation here. We note that the *Alberico* Court made clear that incidental verification of a victim's story or indirect bolstering of her credibility is not by itself improper, and it is only direct comments on the victim's credibility that are beyond the scope of permissible expert opinion testimony. *Id.* As we have explained above, Margaret did not testify as to the credibility of Marisa's statements but merely repeated what she had been told and established the timing of the identifications. So long as the district court's determination that the evidence was more probative than prejudicial was reasonable, we will not overturn its decision. We conclude that the district court did not commit reversible error or abuse its discretion.

**The Lesser Included Second Degree Murder Jury Instruction**

Defendant argues that the jury should only have received an instruction on first degree murder. Specifically, Defendant asserts that the State was bound by the theory of its case, and the lesser included offense instruction for second degree murder should not have been granted. The district court allowed the lesser included instructions for second degree murder and voluntary manslaughter because it found that

> [in] this particular case there was evidence of another homicide having taken place earlier in the day and indications that the victim in that particular homicide had connections in one form or fashion to another in some way to witnesses and . . . Defendant in this particular case that that particular act, that prior homicide could be interpreted by the jury as a provocation for the act having allegedly occurred in this case.

At the outset, the parties disagree as to the proper standard of review on this issue. Defendant contends that we must apply the three-part test set forth in *State v. Meadors*, 121 N.M. 38, 908 P.2d 731 (1995), and that, therefore, the appropriate standard of review is de novo. The State, on the other hand, asserts that *Meadors* is inapplicable and that the standard is sufficiency of the evidence. We begin our analysis by first turning to *Meadors*, and we then address the State's argument.

"A defendant in a criminal case is entitled to know what he is being charged with and to be tried solely on those charges. It is improper to instruct the jury as to a crime not formally charged if that crime is not a lesser included offense of the crime

8

formally charged." *State v. Johnson*, 103 N.M. 364, 371, 707 P.2d 1174, 1181 (Ct. App. 1985) (citation omitted). As a general rule, a defendant is considered to be on notice to defend against uncharged lesser included offenses. *See* Rule 5-611(D) NMRA (providing that the jury can find a defendant guilty of an offense necessarily included in the crime charged if instructed). In *Meadors*, our Supreme Court clarified that a crime is considered a lesser included offense when, under either the statutory elements or the facts alleged in the charging documents and supported by the evidence, the defendant could not have committed the greater offense without also committing the lesser offense. *Meadors*, 121 N.M. at 42-43, 908 P.2d at 735-36. Contrary to Defendant's argument, because the lesser included offenses in this case were not uncharged crimes, *Meadors* is not applicable.

Here, there is no issue that Defendant received constitutionally adequate notice of the charges—including the lesser included charges—being brought against him. Count I of the indictment charged Defendant with first degree murder, second degree murder, and manslaughter. More importantly, the indictment explicitly notified Defendant that "upon trial of this cause the finder of fact may be instructed to consider murder in the second degree." Indeed, Defendant himself and later defense counsel noted that Defendant was charged with an "open count of murder." We note also that at the hearing on jury instructions, defense counsel did not object to the instructions on the lesser included offenses because of inadequate notice to Defendant but objected

9

solely "in light of the evidence that's been presented." Similarly, on appeal, Defendant does not argue that second degree murder was an uncharged lesser included offense. Rather, Defendant contends that the evidence at trial did not support a second degree murder instruction. Consequently, we do not apply a *Meadors* analysis to the facts of this case. We now turn to whether the district court erred in granting the second degree murder jury instruction based on the evidence presented at trial.

**The Evidence Was Sufficient to Support Defendant's Conviction**

We start with the proposition that a district court is warranted in providing the jury with accurate instructions of law on all theories of the case that are supported by substantial evidence. *State v. Brown*, 1996-NMSC-073, ¶ 34, 122 N.M. 724, 931 P.2d 69. The suitability of instructions to the jury, given or denied by the district court, presents a mixed question of law and fact, which we review de novo. *State v. Gaitan*, 2002-NMSC-007, ¶ 10, 131 N.M. 758, 42 P.3d 1207. "To permit an instruction on a lesser included offense, there must be evidence tending to establish the lesser offense." *State v. Fish*, 102 N.M. 775, 779, 701 P.2d 374, 378 (Ct. App. 1985); *see State v. Aguilar*, 117 N.M. 501, 506, 873 P.2d 247, 252 (1994) (holding that instructions on second degree murder as a lesser included offense should only be given if there is a view of the evidence to support the lesser charge).

Defendant contends that the evidence presented by the State was insufficient to sustain a conviction for second degree murder. We review the sufficiency of the

10

evidence pursuant to a substantial evidence standard. *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). Under a substantial evidence standard, the "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992) (emphasis, internal quotation marks, and citation omitted). We will not reweigh the evidence or substitute our judgment for that of the jury. *State v. Graham*, 2005-NMSC-004, ¶ 7, 137 N.M. 197, 109 P.3d 285. "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (alterations, internal quotation marks, and citation omitted).

Before turning to the evidence presented at trial in this case, we first discuss the difference between first degree and second degree murder. As our Supreme Court has noted, the distinction between first degree and second degree murder is not always clearly or easily articulated, but it "is of great importance to the administration of criminal justice." *Garcia*, 114 N.M. at 272, 837 P.2d at 865. While both categories of the crime may be intentional killings, the two crimes are distinguished by the level of intent the State must prove. To prove first degree murder, the State has a heightened burden and must prove that the killing was "willful, deliberate and premeditated." NMSA 1978, § 30-2-1(A)(1) (1994); UJI 14-201 NMRA. Thus, a defendant is guilty of first degree murder when the State proves that he committed "a

11

killing with the deliberate intention to take away the life of another." *Garcia*, 114 N.M. at 271, 837 P.2d at 864 (internal quotation marks and citation omitted). UJI 14-201 defines "deliberate intention" as follows:

> A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

First degree murder is reserved for "the most heinous and reprehensible [of killings], and therefore deserving of the most serious punishment under this state's law[.]" *Garcia*, 114 N.M. at 272, 837 P.2d at 865.

Second degree murder is "killing with knowledge that the killer's act or acts 'create a strong probability of death or great bodily harm.' " *Id.* (quoting Section 30-2-1(B)). Although second degree murder has been construed to include intentional killings, it is committed without the deliberation and premeditation required for first degree murder. *Garcia*, 114 N.M. at 273, 837 P.2d at 866.

The evidence at trial was as follows. At about noon on November 5, 2008, Ervin Samuels, also known as Junior, was shot and killed in a strip mall parking lot. Junior's aunt, Felicia Ellis Samuels, was like a mother to Defendant, and the two men

were friends. Investigators believed a man named Jerel Carter was responsible for killing Junior. In the afternoon of November 5, 2008, a surveillance team went to an apartment complex, which included the apartment building at 1333 Columbia, where they hoped to take Jerel Carter into custody. While waiting for Jerel to show up, the surveillance officers heard gunfire nearby and responded. They found Victim's body in the breezeway of 1333 Columbia and immediately secured the scene.

Katherine Shine was living in a room at the Sahara Motel with Felicia and Felicia's husband, and she was present when Felicia learned of Junior's death. After hearing the news, Katherine drove Felicia to an apartment so that Felicia could talk to Defendant who was shocked and angry at the news. Defendant, along with Felicia and three or four other men present at the apartment, discussed who could have "done it." Katherine testified that Defendant got a gun, loaded it, and then went looking for Junior's killer. At some point, Felicia commented that the Memphis Boys might be responsible for Junior's death, and Defendant said "uh huh." After driving the men, including Defendant, around and possibly stopping at a Circle K at 8:00 p.m., Katherine dropped all the men off at an apartment and then went back to the motel with Felicia.

The next morning, Katherine woke up to Felicia and Defendant having a conversation in the motel room. Katherine testified that Defendant told Felicia that they "got him" and that Felicia was relieved. She also testified that Defendant said

13

"how it was done," and that someone who was there with him took a shot at Victim and missed. After the missed shot, Defendant said he "wasn't going to let him get away" and shot Victim three times. Felicia asked Defendant, "[W]hy did you kill [Victim], he had nothing to do with it?" Katherine testified that Defendant replied that "he was one of the boys from Memphis and he was at the wrong place at the wrong time."

The testimony at trial also established that Miranda used to date Defendant and was pregnant with his child at the time of the shooting. When they were still together, Defendant lived with Miranda at the apartment complex for about two months. Miranda and Defendant had been broken up for a few weeks, and she had not seen him in about three weeks. Shortly after the shooting, Defendant called Miranda to check on her, something he had not done since their break-up. Miranda was surprised that he was even concerned at the time.

Miranda testified that at the time of the shooting, Victim was on his way to her apartment and was bringing her some dinner. The two had been friends for about four months, and Victim, who wanted to date Miranda, gave her rides when she needed transportation and had watched Miranda's children at least once.

Defendant argues that the above evidence only supports a first degree deliberate intent offense. There is no question that the jury could infer from the nature of the act—shooting Victim at least three times—that the killing was intentional. We must

14

consider, however, whether the State proved that Defendant's act of killing Victim could have been rash and impulsive as opposed to only being deliberate and premeditated. Examining the testimony in the light most favorable to the jury's verdict, we conclude that there was sufficient evidence to support Defendant's second degree murder conviction.

A rational jury could conclude that Defendant decided to shoot Victim not "as a result of careful thought and the weighing of the consideration for and against the proposed course of action[,]" *see* UJI 14-201, but because he did not find Junior's real killer and because Victim was a Memphis Boy who happened to be "at the wrong place at the wrong time." The fact that Victim was going to see Defendant's former girlfriend who was pregnant with his child could further support a finding that is consistent with a rash and impulsive killing. We do not dispute that the jury properly found, beyond a reasonable doubt, that Defendant shot Victim three times intending to kill him, or at least with knowledge that his acts created a strong probability of death or great bodily harm. Additionally, there was sufficient evidence from which the jury could infer that Defendant did not form the "deliberate and premeditated," as defined by the district court's instructions, intention to kill Victim but that he acted on impulse when he saw Victim at the apartment complex. The district court recognized as much when it allowed the instruction on the basis that the "prior homicide could be interpreted by the jury as a provocation for the act having allegedly

15

occurred in this case." We affirm the district court's decision in instructing the jury on all of the charged offenses, and we affirm Defendant's conviction with regard to sufficiency on the second degree murder charge.

We briefly address Defendant's additional arguments that there was insufficient evidence to support Defendant's conviction for second degree murder because (1) Marisa's eyewitness identification testimony was so unreliable that it should not be accorded the usual weight, and (2) there was insufficient evidence to connect Defendant to the murder. We take each argument in turn.

As to Marisa's eyewitness identification testimony, Defendant contends that there were issues both with her independent recollection of the events and the accuracy of the physical description she gave of the person she saw. Further, he argues that Marisa's ability to observe the shooting was significantly impeached. As we have stated above, Marisa testified that she witnessed the shooting through both the front door and her brother's bedroom window. She also said that Victim was shot four times. Marisa identified the shooter as the next door neighbor's husband or boyfriend whom she had seen often prior to the shooting. The next door neighbor that Marisa was talking about was Miranda.

Defendant correctly points out that at trial, more than nineteen months after the shooting, Marisa was unable to identify Defendant in the courtroom. However, Marisa did identify Defendant as the shooter right after the incident and days later

16

when his picture appeared on the evening news. We have said repeatedly that any conflicts in the testimony go to the weight and credibility of the evidence and are for the jury to resolve. *See State v. Salas*, 1999-NMCA-099, ¶ 13, 127 N.M. 686, 986 P.2d 482. "Testimony by a witness whom the factfinder has believed may be rejected by an appellate court only if there is a physical impossibility that the statements are true or the falsity of the statement is apparent without resort to inferences or deductions." *State v. Sanders*, 117 N.M. 452, 457, 872 P.2d 870, 875 (1994). Defendant has not articulated any such impossibility or difficulty here. Moreover, the jury here could reasonably have believed that Marisa's memory was more accurate shortly after the events in 2008 than it was when she testified at trial two years later.

We are also not persuaded by Defendant's argument that the State failed to place Defendant at the scene of the crime beyond a reasonable doubt because it had no physical evidence connecting him to the scene of the crime. The State presented direct evidence in the form of Marisa's eyewitness testimony that Defendant shot and killed Victim. In addition, Katherine testified that she saw Defendant arm himself with a handgun and that she was present later at Felicia's motel room when Defendant came and told Felicia that he had shot Victim three times. Katherine also testified that when Felicia said that Victim had nothing to do with Junior's killing, Defendant responded that he did not care and that he "was at the wrong place at the wrong time." There is no requirement for the State to produce the murder weapon or other specific

17

forensic evidence in proving that Defendant committed the crime. The State need only produce sufficient evidence that would support a conviction beyond a reasonable doubt. *State v. Kent*, 2006-NMCA-134, ¶ 10, 140 N.M. 606, 145 P.3d 86. Here, the testimony produced at trial supports Defendant's conviction beyond a reasonable doubt. Further, as we have noted above, any conflicts in the testimony go to the weight and credibility of the evidence and are for the finder of fact to resolve.

**CONCLUSION**

For the reasons set forth above, we affirm Defendant's conviction for second degree murder.

**IT IS SO ORDERED.**


_____
**LINDA M. VANZI, Judge**

**WE CONCUR:**


_____
**JAMES J. WECHSLER, Judge**


_____
**MICHAEL D. BUSTAMANTE, Judge**