2008-NMSC-059

194 P.3d 717

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Leonard Denitri ADONIS,
Defendant–Appellant.**

No. 30,309.

Supreme Court of New Mexico.

Sept. 30, 2008.

Hugh W. Dangler, Chief Public Defender, Nina Lalevic, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

Gary K. King, Attorney General, Anita Carlson, Assistant Attorney General, Santa Fe, NM, for Appellee.

## OPINION

BOSSON, Justice.

{1} In this appeal we consider whether the district court properly ordered the criminal commitment of Leonard Denitri Adonis, Defendant, pursuant to NMSA 1978, Section 31–9–1.5 (1999). In so doing, we resolve two issues: (1) whether the procedure set forth in Section 31–9–1.5 is constitutionally permissible, and (2) whether the State presented adequate evidence to support its theory that Defendant committed first-degree murder. We conclude that Section 31–9–1.5 does not violate any constitutional guarantee and also conclude that the State failed to present sufficient evidence to support the district court's ruling that Defendant committed a deliberate killing. We reverse the district court's order and remand to that court with instructions to amend the commitment order consistent with a finding of second-degree murder. Defendant makes one further argument, which we do not reach, that the district court improperly ordered Defendant's commitment for resisting, evading, or obstructing an officer, a crime not included in Section 31–9–1.5(A). On remand, the district court will enter a new commitment order, thus mooting Defendant's final argument.

## BACKGROUND

{2} At the time Defendant committed the crime at issue, he lived in apartment complex in Albuquerque. Defendant had, for some time, been suffering from paranoid schizophrenia. His symptoms included believing that he had been employed by the New Mexico State Police for more than twenty years, that the CIA and FBI were monitoring him, and that his father was the King of Spain. Despite his delusions, Defendant kept to himself and rarely bothered his neighbors.

{3} On April 18, 2004, Harold Hittson (Victim) decided to visit his brother, Ewell Hittson (Victim's Brother), who was Defendant's neighbor. Defendant did not own a car, and Victim regularly parked in Defendant's parking space without incident. Other residents of the apartment complex, as well as the landlord, also parked in Defendant's parking spot, again without complaint from Defendant. Upon arriving at the apartment complex, Victim once again parked his car in Defendant's parking space, which was located only about ten feet from the front door of Defendant's apartment.

{4} As Victim was getting out of his car, Defendant came out of his apartment and rapidly fired several shots at him with a handgun. Victim was hit twice and ultimate-

ly died from his wounds. When Victim's Brother heard the shots, he left his apartment and saw Victim on the ground next to the front door of his car and also saw Defendant waving the handgun in the air. When Victim's Brother asked Defendant why he had shot Victim, Defendant responded, "[T]hat will teach this guy a lesson not to park in my place no more." Defendant was arrested on an open count of homicide and resisting, evading, or obstructing an officer.

{5} More than a year after his arrest, Defendant and the State stipulated that Defendant was dangerous and not competent to stand trial. Roughly one year after that stipulation, after it was determined that there was no substantial likelihood that Defendant would regain competency, the district court held a hearing pursuant to Section 31–9–1.5 to determine whether Defendant should be criminally committed. At the hearing, the State sought to secure Defendant's commitment for first-degree murder.

{6} In support of its position, the State argued that Defendant deliberately intended to kill Victim for parking in his parking space and that "whoever was the next person to park in that space in front of [Defendant's] apartment was going to get shot." In response, Defendant argued that the State failed to introduce evidence that he had a deliberate intent to murder Victim. Because the State did not establish that he "weighed and considered" killing Victim or that he reflected upon his reasons for and against committing the act before he fired the shots, Defendant argued that he could not be committed for first-degree murder. See UJI 14–201 NMRA ("To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice."). Instead, argued Defendant, the maximum for which he could be committed was the period of time equivalent to a second-degree murder sentence.

{7} Ultimately, the district court ruled that the State had presented clear and convincing evidence that supported committing Defendant for first-degree murder. The district court then issued an order requiring Defendant's commitment for thirty years to life. Defendant appealed to the Court of Appeals from that order, and the Court of Appeals granted the State's motion to transfer the appeal to this Court. See State v. Smallwood, 2007–NMSC–005, ¶ 10, 141 N.M. 178, 152 P.3d 821 ("Since we are vested by law with exclusive appellate jurisdiction in cases involving a sentence of life imprisonment or death, it is clear to us that the legislature conferred this Court with jurisdiction over a criminal defendant's interlocutory appeal in cases where a sentence of life imprisonment or death could be imposed."); see also State v. Reed, 2005–NMSC–031, ¶ 16, 138 N.M. 365, 120 P.3d 447 ("First-degree murder is a capital felony, punished by life imprisonment or death, our most severe criminal penalty.").

## DISCUSSION

### Constitutionality of Section 31–9–1.5

{8} Defendant first contends that the decision of the United States Supreme Court in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), requires us to conclude that Section 31–9–1.5 violates his constitutional right to a jury trial. According to Defendant, because the district court acts as the fact finder in Section 31–9–1.5 hearings, the procedure violates his constitutional right to present his case to a jury and to have the jury apply a standard of beyond a reasonable doubt. See Ring, 536 U.S. at 602, 122 S.Ct. 2428 ("If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt.").

{9} Our Court of Appeals specifically addressed the argument that Defendant now raises in State v. Spriggs–Gore, 2003–NMCA–046, 133 N.M. 479, 64 P.3d 506. The Court concluded that "[c]ommitment pursuant to Section 31–9–1.5 is not punishment," and therefore held that Ring was not controlling in Section 31–9–1.5 proceedings because such proceedings "are not analogous" to the proceedings at issue in Ring. Spriggs–Gore, 2003–NMCA–046, ¶ 22, 133 N.M. 479, 64 P.3d 506.

{10} In this case, Defendant makes no argument that explains why *Spriggs–Gore* is inapplicable to his case, nor does he provide us with any rationale in favor of second-guessing the Court of Appeals' decision in that case. As such, we will not overrule *Spriggs–Gore*. *See State v. Fry*, 2006–NMSC–001, ¶ 41, 138 N.M. 700, 126 P.3d 516 (filed 2005) (stating that a "compelling reason" is required before this Court will overrule precedent). We conclude that Defendant's constitutional argument fails.

## Sufficiency of the Evidence

{11} Defendant contends that the State failed to present clear and convincing evidence at the Section 31–9–1.5 hearing to support the district court's decision to order Defendant's commitment for the time equivalent to a first-degree murder sentence. *See* § 31–9–1.5(D) (requiring a showing of clear and convincing evidence that an incompetent and dangerous defendant committed one of the felonies enumerated in the section before he or she may be detained). "Clear and convincing evidence is evidence that instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *In re Locatelli*, 2007–NMSC–029, ¶ 7, 141 N.M. 755, 161 P.3d 252 (internal quotation marks and citation omitted). If the district court finds that a defendant has committed one of the enumerated crimes by clear and convincing evidence, the court may order that defendant criminally committed for a period of time "equal to the maximum sentence to which the defendant would have been subject had the defendant been convicted in a criminal proceeding." Section 31–9–1.5(D)(2). Thus, if the district court finds that a defendant committed first-degree murder, the resulting criminal commitment may be a period of at least thirty years. *See* NMSA 1978, § 31–18–14 (1993) (providing that capital felonies are punishable by life imprisonment); NMSA 1978, § 31–18–14.1 (2001) ("[L]ife imprisonment means that the defendant shall serve thirty years of his sentence before he becomes eligible for a parole

hearing."). However, a defendant who is found to have committed second-degree murder faces a maximum commitment period of only fifteen years. NMSA 1978, § 31–18–15(A)(4) (2007).

{12} In reviewing the sufficiency of the evidence to support Defendant's commitment for first-degree murder, we must be careful not to substitute our judgment for that of the district court. *See State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992). While we exercise restraint in conducting this review, we must nevertheless subject the evidence presented at the hearing to careful scrutiny to ensure that "*any* rational" fact finder "*could* have found ... the essential facts required" to order Defendant's commitment for first-degree murder. *Id.; see State v. Taylor*, 2000–NMCA–072, ¶ 18, 129 N.M. 376, 8 P.3d 863. If the State failed to present sufficient evidence to support the district court's order committing Defendant for first-degree murder, as Defendant argues, then the court's commitment order was entered in error and remand is required on the issue of commitment for second-degree murder.

{13} Because Defendant's argument hinges on the differences between first-degree and second-degree murder, we begin by discussing the distinction between those two homicides. We acknowledge that the distinction between first-degree and second-degree murder is not always clearly or, for that matter, easily articulated, but it "is of great importance to the administration of criminal justice ... in New Mexico—to say nothing of its importance to a defendant who stands accused ... under an "open" charge of murder." *Garcia*, 114 N.M. at 272, 837 P.2d at 865.

{14} While both first-degree murder and second-degree murder may be intentional killings, the two crimes are distinguished by the level of intent the State must prove.[1] To prove first-degree murder, the State has a heightened burden commensurate with the severity of punishment reserved for that

---

1. This appeal does not concern other types of first-degree murder, namely felony murder, Section 30–2–1(A)(2), or deprave-mind murder, Section 30–2–1(A)(3).

crime. Thus, the State must prove that the killing was "willful, deliberate and premeditated." NMSA 1978, § 30-2-1(A)(1) (1994). In other words, a defendant is guilty of first-degree murder when the State proves that he committed "a killing with the deliberate intention to take away the life of another." *Garcia*, 114 N.M. at 271, 837 P.2d at 864 (internal quotation marks and citation omitted). Our Uniform Jury Instruction for willful or deliberate murder, UJI 14-201, explains the meaning of "deliberate intention" as follows:

A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

{15} First-degree murder is reserved for "the most heinous and reprehensible [of killings], and therefore deserving of the most serious punishment under this state's law." *Garcia*, 114 N.M. at 272, 837 P.2d at 865. Because of the severity of punishment that first-degree murder carries, it is clear that the Legislature did not intend to "lump within [first-degree murder] all other killings, even those which may in some sense be intentional but which lack the characteristics of deliberation and premeditation." *Id.*

{16} Second-degree murder, on the other hand, is "a killing with knowledge that the killer's act or acts 'create a strong probability of death or great bodily harm.'" *Id.* (quoting § 30-2-1(B)). Second-degree murder differs from first-degree murder because, although it may be intentional, it is committed without the deliberation and premeditation required for first-degree murder. Thus, if the State merely proves that the accused

acted rashly or impulsively, rather than deliberately, and if the accused acted intentionally and without justification or provocation, then the facts would only support second-degree murder. *See State v. Duran*, 2006-NMSC-035, ¶ 10, 140 N.M. 94, 140 P.3d 515 (explaining first-degree murder cannot be adequately supported when no evidence is presented that "could reasonably lead the jury to infer that the defendant had acted with deliberation rather than rashly and impulsively"); *Black's Law Dictionary* 1043 (8th ed.2004) (noting that "[a]ll types of murder not involving willful, deliberate, and premeditated killing are [usually] considered second-degree murder").

{17} With these important distinctions in mind, we now turn to Defendant's challenge in the present appeal. We focus our inquiry on whether the State met its burden of proving every element of first-degree murder by clear and convincing evidence. We consider whether the State proved that Defendant's act of killing Victim, which was clearly intentional, was also deliberate and premeditated, as opposed to proving only that Defendant's acts, though intentional, were rash and impulsive.

{18} We begin our discussion by acknowledging the "anomaly" that our Court of Appeals recognized in *Taylor*, 2000-NMCA-072, ¶ 16, 129 N.M. 376, 8 P.3d 863. The Court explained that, under the commitment statute, even though first-degree murder is a specific intent crime, a defendant in a Section 31-9-1.5 hearing may not attempt to disprove specific intent by relying on a lack of mental capacity to form the intent required to commit the crime. *Taylor*, 2000-NMCA-072, ¶ 16, 129 N.M. 376, 8 P.3d 863. In the present case, Defendant does not challenge this "anomaly." Instead, Defendant follows the path specifically mapped out in *Taylor*; he focuses his argument on the State's failure to prove every element of first-degree murder, including specific intent, by clear and convincing evidence. *See id.* ¶¶ 16, 17 (explaining that the proper way for an incompetent defendant in a Section 31-9-1.5 hearing to "fend off a specific intent crime" is to attack the sufficiency of the State's evidence

going toward the specific intent element of the crime).

{19} In making his argument, Defendant relies on a factual similarity with *Taylor*, where the defendant shot and killed his wife after she struck their child. *Taylor*, 2000–NMCA–072, ¶ 5, 129 N.M. 376, 8 P.3d 863. Taylor, who later was found to be competent, and stipulated that he was dangerous and incompetent to stand trial, explained that he shot his wife because he believed she was possessed by the devil. *Id.* ¶¶ 2, 5. Following the Section 31–9–1.5 hearing, the district court ruled that the State had established by clear and convincing evidence that the defendant had committed first-degree murder. *Taylor*, 2000–NMCA–072, ¶ 7, 129 N.M. 376, 8 P.3d 863. The Court of Appeals reversed, noting that "[t]he strongest evidence supporting the district court's finding of first degree murder was [the d]efendant's admission to the police that he armed himself with a hand gun and shot [his wife] after she hit their daughter," but also noting that the evidence presented to the district court "provided no details of reflection or contemplation before the killing, as required of first degree murder convictions." *Id.* ¶ 22.

{20} Similar to *Taylor*, Defendant argues that the State failed to meet its burden of proving deliberation. The State failed to present evidence that provided any details of reflection or contemplation before the killing, or from which a fact finder reasonably could infer such deliberation. In response, the State distinguishes *Taylor*, arguing that Defendant had formulated a plan to kill the next person who parked in his parking space and also "had to perform a number of actions," including seeing a car parked in his parking space, getting his gun, opening his front door, and taking a few steps toward the car, before he was able to fire shots at Victim. The State also emphasizes that Defendant told Victim's Brother, after he shot Victim, that he had shot Victim to teach him a lesson not to park in his parking space anymore.

{21} The State's efforts to distinguish this case from *Taylor* are unpersuasive. For instance, there is nothing in the record suggesting that Defendant had a "plan" to kill the next person who parked in his parking

spot. No evidence was presented that Defendant ever complained about anyone parking in his space or that he ever made any threats to hurt anyone for parking in his parking space. On the contrary, the evidence established that others, including Victim, regularly parked in Defendant's parking space without as much as a polite request from Defendant to cease. Any argument that Defendant had a plan—of any kind—is just conjecture.

{22} While the retrieval of a weapon before killing a victim could potentially give a killer an opportunity to deliberate, the burden remains on the State to produce evidence that tends to show that the killer "actually did so." *Taylor*, 2000–NMCA–072, ¶ 22, 129 N.M. 376, 8 P.3d 863. In this case, the evidence fails. The State did not introduce any evidence about what Defendant actually did before he shot Victim. For example, there was no eyewitness testimony about the events leading up to the shooting, nor was there any testimony from a co-conspirator, or any other witness, that could shed light on Defendant's plan or motive to kill Victim. In short, the facts relied upon by the State only prove that Defendant killed Victim intentionally, but fail to prove that Defendant committed the killing with the deliberate intention to take Victim's life, which is necessary to prove first-degree murder.

{23} The State also argues that two cases decided by this Court after *Taylor* support the district court's ruling that Defendant deliberated before he killed Victim. First, the State relies on *State v. Sosa*, 2000–NMSC–036, ¶ 14, 129 N.M. 767, 14 P.3d 32, where we concluded that the State met its burden of proving deliberation for purposes of first-degree murder. In that case, the State presented evidence that tended to show that the defendant went to the victim's home armed with a gun and with the intent to kill him, waited for him to arrive, shot him in the face when he arrived, and then followed him into the street before shooting him again from behind. *Id.* Second, the State relies on *Duran*, 2006–NMSC–035, ¶ 11, 140 N.M. 94, 140 P.3d 515, where we also concluded that the State met its burden of proving deliberation

in a first-degree murder case by presenting evidence of a prolonged struggle with the victim, multiple stab wounds inflicted on the victim as she attempted to escape, and testimony regarding the defendant's statements that "revealed his intent in his later description of his actions." Both of these cases contain details reflecting on the accused's state of mind, details that are missing from the present case.

{24} Unlike in *Sosa* and *Duran*, the State did not present evidence that Defendant was lying in wait to kill Victim, that Defendant specifically intended to kill Victim, that Defendant shot at Victim and then waited any period of time within which to reconsider his actions before shooting again, or that he later indicated his deliberate intent to kill Victim. While Defendant did fire multiple shots, that alone does not indicate that Defendant deliberated before shooting Victim. The scant evidence presented at the Section 31-9-1.5 hearing was simply insufficient to allow a rational fact finder to conclude that Defendant acted deliberately, rather than rashly and impulsively, in killing Victim. *See Duran*, 2006-NMSC-035, ¶ 10, 140 N.M. 94, 140 P.3d 515.

{25} Finally, to the extent that the State relies on Defendant's statement after killing Victim to support its position that Defendant deliberately intended to kill him, this Court's decision in *Garcia* is dispositive. In *Garcia*, we concluded that an accused killer's confession to a law enforcement officer that he would have killed the victim "again if given a second chance" was insufficient to show that he had deliberated before killing the victim. *Garcia*, 114 N.M. at 275, 837 P.2d at 868. Such an inferential leap must be supported by other specific evidence tending to prove that the defendant actually deliberated before killing the victim. *Id.; see also Taylor*, 2000-NMCA-072, ¶ 22, 129 N.M. 376, 8 P.3d 863 (listing evidence of "a carefully crafted plan to kill, . . . hot pursuit of the victim," and "a manner of death requiring an extended time to complete" as potentially adequate to show deliberation for purposes of proving first-degree murder). As in *Garcia*, the record before us is devoid of any indication that Defendant actually deliberated before killing

Victim. Absent such a corroborative showing, Defendant's statement is insufficient on its own to prove deliberation. *See Garcia*, 114 N.M. at 275, 837 P.2d at 868 (explaining that although the defendant's post-killing statement that he would "do" the victim again could be construed to demonstrate his intent to kill again if given another chance, it did not necessarily show that the defendant "deliberated and intended to kill his victim before the stabbing").

{26} After reviewing the evidence presented by the State, we are not persuaded that a rational fact finder could find that the State's evidence "instantly tilt[ed] the scales in the affirmative when weighed against the evidence in opposition." *In re Locatelli*, 2007-NMSC-029, ¶ 7, 141 N.M. 755, 161 P.3d 252 (internal quotation marks and citation omitted). We imply no criticism of the prosecutor in coming to such a conclusion. Here, the prosecutor did not have much to work with. We assume there were no eyewitnesses available, and Defendant apparently made no incriminating statements demonstrating the necessary deliberation. The thin record available simply leaves too much doubt, and too much room for conjecture, about Defendant's thought process. Such evidence, though perfectly capable of demonstrating an intentional killing and commitment for second-degree murder, falls short of carrying the necessary burden of proof for an intentional *and deliberate* killing. Accordingly, Defendant's commitment for thirty years to life must be reversed. Because there is no dispute that the record supports a finding of second-degree murder, a lesser included offense, the trial court can amend its commitment order accordingly without a new evidentiary hearing. *See State v. Haynie*, 116 N.M. 746, 748, 867 P.2d 416, 418 (1994).

## CONCLUSION

{27} We reverse the district court's order and remand to that court with instructions to amend the commitment order consistent with a finding of murder in the second degree.

{28} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA, PETRA JIMENEZ MAES, and CHARLES W. DANIELS, Justices, and EDWARD L. CHÁVEZ, Chief Justice, (dissenting).

CHÁVEZ, Chief Justice (dissenting).

{29} When I consider the reasonable inferences that support the trial court's findings, I continue to believe that there was substantial evidence to support the finding that Defendant committed first-degree murder. Therefore, I must respectfully dissent.

{30} The State's first witness was Ewell Glenn Hittson (Ewell), brother of the victim, Harold Hittson. At approximately 9:30 p.m., Ewell was watching television when he heard two shots near his door. He went outside and saw Defendant holding a revolver, saying something to the effect of "that will teach this guy a lesson not to park in my place no more[.]" Defendant then barricaded himself in his apartment, and after three hours, the SWAT team managed to talk him out.

{31} The State's second witness was Officer Jeffrey Young. He received a call to investigate the shooting, and along with Officer George Vega and a third unnamed officer, arrived on the scene within sixty seconds after being dispatched. He was flagged down by Ewell and he saw the victim lying on the ground with his feet partially in a white car. Officer Young reported that the victim's body had been moved by his brother, that the victim had suffered two apparent gunshot wounds, and described blood spatter evidence near the body and in the car. He also described a shallow bullet impact on the car that indicated the shooter's location when he shot the victim. The victim had no defensive wounds on his body or gunshot residue on his body or clothing, which suggests that the shooter was at least four feet away when the shots were fired. Examination of the revolver used showed that four rounds had been fired from it; the crime scene accounted for three shots, including the shallow impact angle of the bullet that struck the car. The weight of the bullets recovered from the victim's body showed that the projectiles were consistent with those fired from the weapon in question, a Smith & Wesson .38 special. The bullets were consistent with those remaining in the box of .38 caliber shells found in Defendant's apartment and with ten loose live rounds found in Defendant's backpack, which also contained the revolver.

{32} In my opinion, the trial court could draw reasonable inferences that would support a finding of first-degree murder by clear and convincing evidence. Defendant's unsolicited remarks that he shot the victim to teach him not to park in his space seem adequate to support a reasonable inference that he had thought about what he did, or even planned it, and waited for the next person to park in what he considered to be his parking space, only to approach the unlucky victim and shoot him. "Lying in wait" might be an accurate description. The reasonable inference is that Defendant wanted to teach this victim not to park in his space and the lesson he planned was shooting the victim. Since Defendant shot at the victim not once but four times, striking the victim twice, the reasonable inference is that Defendant intended to kill the victim, not just frighten him. I believe it is also significant that the victim was in the car at the time he was shot and that the officers did not find any evidence of defensive wounds. The trial court, having heard this testimony, could reasonably infer that the victim did not provoke Defendant, even if the provocation was insufficient, which distinguishes this case from *State v. Taylor*, 2000–NMCA–072, 129 N.M. 376, 8 P.3d 863. In *Taylor*, the defendant's statements suggested the use of a gun in reaction to what he considered to be physical abuse by the victim, his wife, toward their eighteen-month-old daughter. In this case, parking in a space that was not even assigned to Defendant can hardly be considered provocation. As was evident from the testimony, Defendant knew that people parked in that space all the time, and he did not complain about it to the landlord or anyone else. Yet, on this occasion, Defendant's spontaneous remarks following the shooting illustrate that he weighed and considered the question of killing and his reasons for it. He was motivated to shoot and kill this victim for having parked in the parking space located in front of Defendant's apartment. The trial court might have

found, as does the majority, that this was a rash impulse, but the court as fact-finder did not. Looking at the evidence in the light most favorable to the finding, I find sufficient evidence to support the trial court.

{33} For the foregoing reasons, I respectfully dissent.