This decision was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court and does not include the filing date.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:_____

Filing Date: _____

**NO. 30,491**

**STATE OF NEW MEXICO**,

     Plaintiff-Appellee,

v.

**DWIGHT WAGNER**,

     Defendant-Appellant.


**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Stephen K. Quinn , District Judge**


Liane E. Kerr, LLC
Liane E. Kerr
Albuquerque, NM

for Appellant


Gary K. King, Attorney General

Nicole Beder, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**BOSSON, Justice.**

{1}     Dwight Wagner (Defendant) appeals the district court's determination that he committed first-degree murder, resulting in his confinement for thirty years by the State Department of Health in a secure, locked facility under the New Mexico Mental Illness and Competency Code. *See* NMSA 1978, §§ 31-9-1.2 to -1.5 (1999). He advances two arguments: (1) the State failed to present sufficient evidence that Defendant had the requisite level of intent for first-degree murder, and (2) the district court should not have admitted into evidence Defendant's statement to police, because those statements were involuntary. Unpersuaded, we affirm the district court.

**BACKGROUND**

{2}     On December 28, 2004, Clovis police responded to a call for a welfare check on 75-year-old Essie Thomas. They arrived at her house at 716 West Grand in Clovis to find Defendant, her son, outside talking to neighbors. Police testified that Defendant appeared nervous and hurried. He told neighbors his mother had gone to the mall, and he quickly departed on foot when police arrived. Neighbors then told police that Thomas would not have gone to the mall without taking her car. The officer at the scene summoned backup, and the two officers determined that Thomas's

car was still in the garage. Police then summoned the fire department to pry open Thomas's front door.

{3} Inside the house, police discovered a scene of bloody struggle. Immediately upon entering , police saw piles of ashes and matchsticks on top of Thomas's piano. A burning smell permeated the house. The police then entered the living room to discover overturned furniture and further evidence of violence and struggle. Proceeding further, the police saw blood throughout the house—some of it in pools, some of it in drops across the floor, and some of it in smears on walls and objects throughout the house. Police testified that it appeared that a bloody body had been dragged through the house. Following the trail of blood, police discovered Thomas's body, in a fetal position and soaked in her own blood, in her bathtub. There was evidence throughout the house that small fires had been lit and then extinguished. Police also found multiple crack pipes and other drug paraphernalia scattered about.

{4} Thomas's autopsy concluded that she died from blunt force injuries to her head, and that she suffered multiple lacerations of her scalp, bleeding around her brain and multiple skull fractures. Based on the blood-spatter patterns throughout the house, investigators deduced that Thomas had been beaten about the head in three or four separate locations around the house. Police concluded that these separate incidents of violence occurred over a period of perhaps an hour. There was a large amount of blood on the back of a loveseat in the living room, indicating that Thomas had

remained stationary there for a time, bleeding. There was another concentration of blood near Thomas's bedroom door, indicating that she had moved from the loveseat and been beaten again as she laid down, or perhaps crawled, near the door. Sgt. Kirk Roberts of the Clovis Police Department, who has specialized training in blood-spatter analysis, testified that there was "high velocity blood spatter" on the bedroom door, indicating a particularly violent beating. The spatters were at an angle showing that the beating happened while Thomas was on the floor, and also perhaps while she was crawling, Sgt. Roberts testified. Droplets on and near Thomas's nightstand, inside her bedroom, indicated that at this late point in her injuries, she was still attempting to stand up and escape her attacker. Near a door leading from Thomas's bedroom to the garage, there was another pool of blood, indicating that Thomas stopped for a time, still bleeding. Here, the blood patterns changed. There were drag marks instead of droplets, indicating that Thomas was now dragged to her next and final resting spot in the bathtub. Near the conclusion of the drag marks, police found a battered lamp, which they concluded was the weapon used to repeatedly beat Thomas. The lamp's base was bent and broken and much of the lamp was covered in blood. Fibers on the lamp matched a blood-soaked wig found at the house. Thomas was known to habitually wear a wig.

{5} Thomas's body was subjected to further violence in the bathtub where she apparently died. Numerous items were thrown in on top of her, including a bucket,

4

a mannequin head, a container of Epsom salts and a green tub, creating a scene of "disorganized violence," according to Sgt. Roberts. Spattering suggested that she was thrown into the tub, and blood smears suggested that Thomas's head was originally toward the top edge of the tub, but slid down as she assumed the fetal position. Police estimated that Thomas had been dead for several days when they found her, meaning she died around December 24 or 25.

{6} Police found a bloody footprint at the scene, consistent with Defendant's shoes, which had blood on them when police arrested him. DNA in the blood on Defendant's shoes, size 11, navy-and-white Avias, matched Thomas's DNA. Defendant's fingerprint was found on a beef jerky bag in the dining room. Police also found $2,000 in cash in a drawer in Thomas's dining room. They later learned that Thomas had recently received an insurance settlement of around $4,000.

{7} Outside Thomas's house, shortly after police discovered the body, a neighbor told police that a man was sitting on the neighbor's porch around the corner, and that he refused to leave. Police went to investigate, and quickly saw a man lying down near the porch. The responding officer, 17-year veteran Dan Aguilar, recognized the man as Defendant, with whom Aguilar had had "over ten" previous encounters involving criminal, or allegedly criminal, activity. At least two of the previous encounters involved incidents where Defendant set, or attempted to set, fires. Aguilar called out to Defendant by name, and ordered him to put his hands up. Defendant did

not comply. When police approached him, Defendant put items from his closed hand into his mouth. Aguilar, struggling to put handcuffs on Defendant, asked him what he swallowed. Defendant said it was ten rocks of crack cocaine. Defendant began struggling, and it took three officers to subdue him. Aguilar testified that Defendant then "became extremely violent," and told police "to shoot him [Defendant] or just to kill him now." In Defendant's pocket police found a garage-door opener. They tested it on Thomas's garage, and it worked. Defendant was transported to the Plains Regional Medical Center. En route to the hospital, he told Officer Russ Gould to shoot him because he didn't "deserve to live."

{8} Several days later, Sgt. Roberts encountered Defendant in the booking area of the jail. Defendant told Sgt. Roberts that he wanted to talk. Sgt. Roberts read Defendant his Miranda rights. Defendant waived them. Defendant then told Sgt. Roberts that he owed a man named Larry Lucero money for drugs, and that Defendant had gone to his mother's house with Lucero to ask her for the money. Defendant said that his mother said "absolutely not. I'm not giving you the money," and then told him she was going to call the police. Defendant said that Lucero then threatened his mother, telling her that he would kill either her or Defendant if she didn't give up the money. Defendant said his mother still refused, so Lucero began beating her. Defendant said he tried to stop the violence but failed. Defendant said that although he considered his mother his best friend, he failed to call police because

he was still on probation for an earlier offense and didn't want to go back to jail. He said after the beating, Lucero took the money and gave Defendant about $400 of it, and that Defendant and Lucero used the money to buy crack cocaine and returned to the house to smoke it over the next two days, while Thomas's body sat in the bathtub.

**{9}** Sgt. Roberts testified that he was "very suspicious" of this account, because over many years of encounters with Lucero, Sgt. Roberts had come to understand that Lucero was "not an aggressive person," while his multiple encounters with Defendant had virtually all involved violent activity on the part of Defendant. "If [Defendant] had wanted to stop Larry Lucero, he could have very easily stopped him," Sgt. Roberts testified. Police interviewed Lucero and he denied ever having been in the house. Tests on Lucero's sneakers revealed that there may have been blood on them which was washed off. Police also found the same brand of beef jerky in Lucero's house that was in Thomas's house. Strong evidence suggested that Defendant and Lucero had recently stolen a large quantity of beef jerky from a convenience store.

**{10}** Defendant was charged by criminal complaint with first-degree murder. On March 22, 2006, the parties stipulated, and the district court found, that Defendant was incompetent and dangerous within the meaning of Section 31-9-1.2, and he was therefore sent to the Las Vegas Medical Center, under the supervision of the New Mexico Department of Health. After a subsequent mental evaluation, on December 16, 2006, the parties again stipulated that Defendant was incompetent and dangerous.

The Court scheduled a hearing pursuant to Section 31-9-1.5 (Section 1.5 hearing) to determine sufficiency of the evidence to commit Defendant criminally. On February 6, 2007, the district court held the evidentiary hearing, the substance of which is recounted above. Defendant argued at the hearing that the State had failed to present evidence that Defendant had premeditatedly or deliberately intended to kill his mother. Defendant also argued that while the State had placed Defendant at the scene, the State had not sufficiently connected him with his mother's murder, particularly in light of Lucero's purported involvement, which Defendant argued was a plausible alternative to the State's theory. In an order dated April 2, 2007, the district court concluded that the State had shown by clear and convincing evidence that Defendant committed first-degree murder. The court ordered Defendant "detained by the Department of Health . . . in a secure, locked facility," for thirty years.

{11}   Defendant argues to this Court that the State failed at the evidentiary hearing to present sufficient evidence that Defendant's actions were premeditated, or that he deliberately intended his mother's death, and that the district court erred in denying Defendant's motion to suppress his statement to police.

**DISCUSSION**

**Sufficiency of the Evidence**

{12}   Under our State's Mental Illness and Competency Code, Sections 31-9-1.2 to -1.5, if a defendant is determined to be dangerous as well as incompetent to stand trial

on the merits, and the State shows at an evidentiary hearing, by clear and convincing evidence, that he killed another person with deliberate intent within the meaning of NMSA 1978, § 30-2-1(A) (1994), the court may criminally commit the defendant to a secure, locked facility run by the Department of Health, for the time equivalent to a first-degree murder sentence.

{13}    A defendant is guilty of first-degree murder if the State proves that he committed the killing "with the deliberate intention to take away the life of another." *State v. Garcia*, 114 N.M. 269, 271, 837 P.2d 862, 864 (1992) (internal quotation and citation omitted). The first-degree murder statute does not define "deliberate," but our Uniform Jury Instruction 14-201 explains:

> The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of consideration for and against the proposed course of action. A calculated judgement and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

{14}    Deliberate intent can be inferred from the "particular circumstances of the killing as proved by the State through the presentation of physical evidence." *State v. Duran*, 2006-NMSC-035, ¶ 8, 140 N.M. 94, 140 P.3d 515. More specifically, a finder of fact can infer deliberate intent for first-degree murder purposes "based on the nature and extent of the victim's injuries," combined with further evidence such as

statements or actions following the death. *Id.* ¶ 9.

**{15}** "Clear and convincing evidence is evidence that instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *State v. Adonis*, 2008-NMSC-059, ¶ 11, 145 N.M. 102, 194 P.3d 717 (internal quotation marks and citation omitted). In reviewing the sufficiency of the evidence, we must be careful not to substitute our judgment for the district court's judgment. *See Garcia*, 114 N.M. at 274, 837 P.2d at 867.

**{16}** In *Duran*, 2006-NMSC-035, ¶ 8, this Court held that deliberate intent could be validly inferred from a "prolonged [physical] struggle and multiple stab wounds," where blood spatter evidence showed the victim tried to prevent the attacker from entering her bedroom, and she also tried to escape from a window. When combined with the defendant's statements, after the killing, that he "straight up murdered some bitch," *id.* ¶ 9, this Court concluded that a reasonable jury could conclude that he had killed with the requisite deliberate intent, *id.* ¶ 11.

**{17}** The present case is closely analogous to *Duran*. The evidence presented at the criminal commitment evidentiary hearing shows that the victim was beaten in at least three, and probably four, separate locations throughout the house, probably over the

10

course of about an hour. Between each of the four beatings, all of which appear to have been severe and bloody, there were pauses at least long enough for the attacker to stop and consider his actions. After each of the pauses, the attacker made the decision to keep beating the victim, a 75-year-old woman, about the head with a lamp—actions which could have no other result than severe injury or death, the latter being more likely with a victim as frail as the one in this case. The physical evidence shows that in these periods between assaults, when Defendant could have ceased the violence and called an ambulance, he instead decided to continue. Like the evidence in *Duran*, 2006-NMSC-035, ¶¶ 8-9, which showed that the attacker there pursued the victim despite her attempts to flee, the evidence in this case shows that the victim attempted to flee her attacker, but Defendant continually pursued nonetheless. As in *Duran*, the repeated beatings here replete with multiple pauses, which were not evident in *Duran*, demonstrate a premeditation that fulfills the requirements of our first-degree murder statute.

{18} Defendant cites *Adonis*, 2008-NMSC-059, to support his argument that the State in this case failed to present sufficient evidence of Defendant's deliberation and premeditation. But *Adonis* is not analogous. In *Adonis*, we concluded that the State had failed to present sufficient evidence for first-degree murder where the evidence

11

showed the defendant walked out of his apartment yelling and then without warning fired several shots at the victim, allegedly because the victim parked in the defendant's parking space. *Id.* ¶¶ 3-4. We reasoned that the State presented no evidence that the defendant planned the attack or contemplated the killing, and, in fact, there was little evidence to support that the killing was due to anything other than a rash impulse. *Id.* ¶ 21. By contrast, the State here presented an abundance of evidence about Defendant's actions prior to his mother's death. As we have already noted, the physical evidence in the house paints a convincing portrait of a bludgeoning death that played out in separate stages over a period of time. It is further evident that Defendant pursued his mother across the house, pausing between beatings. In *Adonis*, the evidence showed that the killing happened virtually instantaneously. Accordingly, Defendant's sufficiency of the evidence claim fails.

**Admissibility of Statement**

{19} Defendant argues, pursuant to *State v. Franklin*, 78 N.M. 127, 428 P.2d 982 (1967) and *State v. Boyer*, 103 N.M. 655, 712 P.2d 1 (Ct. App. 1985), that the district court erred by denying his motion to suppress his statements to police. Defendant appears to argue, although it is not entirely clear in the briefing, that the district court should have found his statement to police inadmissible because of the subsequent

12

determination that Defendant was incompetent. Although we do note that it is a settled matter of constitutional law that a defendant's mental state, by itself, does not render an inculpatory statement to police involuntary, *see Colorado v. Connelly*, 479 U.S. 157, 164-65 (1986), we need not address the merits of this argument, because we conclude that the admission of the statement, even if erroneous, was harmless beyond a reasonable doubt, *see State v. Barr*, 2009-NMSC-024, ¶ 53, 146 N.M. 301, 210 P.3d 198 (indicating that when a violation of constitutional as opposed to statutory or rule-based rights is at issue, we determine error is harmless only where there is "no reasonable *possibility* it affected the verdict"). Here, the abundance of inculpatory physical evidence alone would have been sufficient to conclude that Defendant killed his mother; and, in fact, on appeal Defendant acknowledges that the evidence showed that he "likely" killed his mother, and argues only that the State failed to prove the elevated mental state necessary for first-degree murder. The abundant evidence also shows that Defendant committed first-degree murder, for reasons articulated above. Furthermore, Defendant's statements to police were largely attempts at establishing a defense which did little to aid the State's case. Aside from definitively placing Defendant at the scene, which the physical evidence already did, the statements did little to advance the State's case, and therefore there is no reasonable possibility the

statements affected the district court's decision.

**CONCLUSION**

{20} We affirm the decision of the district court.

{21} **IT IS SO ORDER.**

_____
**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____
**EDWARD L. CHÁVEZ, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**CHARLES W. DANIELS, Justice**