This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court and does not include the filing date.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number:** _____

**Filing Date:** <u>February 7, 2013</u>

**NO. 32,837**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**KENNETH C. RAUCH,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DONA ANA COUNTY**
Lisa C. Schultz, District Judge

The Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant

Gary K. King, Attorney General

M. Victoria Wilson, Assistant Attorney General

Santa Fe, NM

for Appellee

## DECISION

**MAES, Chief Justice.**

{1} Following a jury trial, Kenneth C. Rauch (Defendant) was sentenced to life imprisonment for one conviction of willful and deliberate first-degree murder, and twenty-three years for the remaining counts of attempt to commit deliberate first-degree murder, aggravated assault with a deadly weapon, extortion, possession of a firearm by a felon, and false imprisonment. Defendant appeals to this Court pursuant to Rule 12-102(A)(1) NMRA (an appeal from a sentence of life imprisonment is taken directly to the Supreme Court). Defendant appeals all convictions on the basis of insufficient evidence, except felon-in-possession of a firearm and false imprisonment.

## I. FACTS AND PROCEDURAL HISTORY

{2} Defendant borrowed a shotgun from his son and went to the foothills to practice shooting. Later that night Defendant purchased some buckshot ammunition from a Wal-Mart that would "do the most damage." Defendant then returned to his apartment where he modified the shotgun so as to increase the number of shells the gun could shoot before it would have to be reloaded.

{3} After Defendant modified the shotgun, he had dinner and drinks with his girlfriend. As Defendant ate and drank his mood began to change. Defendant began

to grow increasingly sad due to the loss of one of his sons, and informed his girlfriend that he did not wish to live anymore. Later that evening, around 11:00 p.m., Defendant told his girlfriend that he was going to commit suicide, left the apartment with the modified shotgun, and headed directly toward a Shell gas station.

{4} As Defendant was heading toward the gas station, a vehicle pulled up and parked at a gas pump. There were three people in the vehicle, Eusebio Escobedo (Victim), his fiancé Lucia Aldaba (Aldaba) and her young son. Defendant walked over to the passenger side of the vehicle, stood in front of the windshield, raised the shotgun, pointed it directly at Aldaba and fired the gun. The shot went inside the engine, really close to the windshield. Victim attempted to exit the car at that time. Defendant then proceeded to the driver's side of the vehicle. Aldaba reached over and pulled Victim away from the door. Victim then leaned over and tried to shield Aldaba from Defendant. Defendant cocked the shotgun, aimed, fired, and shot Victim in the head. Defendant then walked into the Shell convenience store and Aldaba and her son fled from the car.

{5} There were three people in the Shell convenience store when Defendant entered: two store clerks, Mr. Armendariz and Ms. McNutt (collectively "Clerks"), and a customer, Ms. Slee (Slee). The Clerks, not realizing that Slee was still in the store, ran to the back office and locked the door. Slee observed Defendant enter the store carrying the shotgun, pointed upwards. While the Clerks were in the office they

2

observed Defendant on the store's security cameras, and could hear his conversation with Slee. The Clerks heard Defendant tell Slee to ask the Clerks their names. Then Defendant threatened to shoot down the door if the Clerks did not open it. Slee began pleading with Defendant asking him to either let her leave the store or go into the office with the Clerks. Defendant refused Slee's requests, but assured her he was not going to hurt her, and that if she were to get shot, it would be by the police and not by him. Defendant also told Slee that he had intended to kill himself that night.

{6} Defendant, while still holding the gun, told Slee to go behind the counter and get him a bottle of vodka. Slee retrieved the bottle from behind the counter and Defendant sat and drank some vodka. Defendant then allowed Slee to join the Clerks in the office.

{7} When the police officers arrived at the scene they observed Defendant walk around the store with the shotgun and then sit down to drink some vodka. The officers then entered the store and arrested Defendant. Although they observed Defendant drinking vodka, none of the officers at the scene reported Defendant exhibiting signs of intoxication.

{8} Before trial, Defendant requested a competency evaluation and was found competent to stand trial. At trial, Defendant based his defense on his history of mental illness. Defendant asserted that due to his depression and intoxication, he did not realize that people were in the vehicle when he fired the shots and he, therefore,

3

lacked the requisite mental intent to be found guilty of either deliberate first-degree murder or attempted deliberate first-degree murder.

{9}	To support Defendant's assertion that he was unable to form the requisite intent, clinical psychologist, Dr. Eric Westfried, who conducted a criminal forensic evaluation of Defendant, testified at trial. Dr. Westfried's interview with Defendant revealed that Defendant had lost multiple family members within the span of one year and he had developed post-traumatic stress disorder as a result. Dr. Westfried noted that although he concluded that Defendant was emotionally unstable and irrational at the time of the shooting, Defendant had scored in the high average to superior range on the cognitive functioning exam. In Dr. Westfried's opinion, Defendant was suffering from mental health issues, suicidal thoughts and was too intoxicated to have formed a deliberate intent to kill. Dr. Westfried, however, stated that Defendant's behavior immediately after the shooting seemed to be quite rational and therefore, he was not prepared to say that Defendant was incapable of forming the requisite intent to support the charges that occurred inside the convenience store.

{10}	The State countered Dr. Westfried's conclusion with testimony from its own clinical psychologist, Dr. Edward Ned Siegel, who also evaluated Defendant. Despite Defendant's original claim that he had killed Victim because Victim raped his daughter, Defendant told Dr. Siegel that that was a lie and he did not actually know Victim. Defendant reported to Dr. Siegel that on the day of the shooting, he had

4

consumed three to four pints of vodka. Dr. Siegel testified that he questioned the veracity of Defendant's story because a person who consumed that much alcohol would have been hospitalized or dead. Dr. Siegel agreed with Dr. Westfried that Defendant was suffering from depression, alcoholism, and suicidal thoughts, but disagreed that Defendant was unable to form specific intent on the night he killed Victim. Dr. Siegel testified that it is clinically impossible to be able to form specific intent one moment but not the next. Dr. Siegel concluded that because Defendant acted rationally towards police and was cognitively functioning mere moments after the killing, Defendant was able to form specific intent to kill at the time of the shooting. Dr. Siegel also concluded that Defendant's ability to form the intent to commit suicide was evidence of his ability to form any specific intent.

{11} Defendant appeals his conviction of life imprisonment plus twenty-three years, followed by five years parole, directly to this Court. This Court exercises appellate jurisdiction where life imprisonment has been imposed. N.M. Const. art. VI, § 2; *see* Rule 12-102(A)(1) NMRA (providing that an appeal from sentence of life imprisonment is taken directly to the Supreme Court). Defendant asserts that there was insufficient evidence to support his convictions. Specifically, Defendant argues: (1) there was not sufficient evidence of a deliberate intent to kill Victim or attempt to kill Aldaba to support a conviction of first-degree murder and attempted murder; (2) there was not sufficient evidence of a communication of a threat by Defendant to

5

support a conviction of extortion; and (3) there was not sufficient evidence of fear of immediate battery to support a conviction of aggravated assault.

## II. STANDARD OF REVIEW

{12}    In reviewing the sufficiency of the evidence, this Court must determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). We view the evidence "in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176.  This Court does not re-weigh the evidence and does not substitute its judgment for that of the fact finder so long as there is sufficient evidence to support the verdict. *Sutphin*, 107 N.M. at 131, 753 P.2d at 1319.  When there is substantial evidence to support the conviction, the verdict will not be disturbed on appeal. *Id.*

## III. DISCUSSION

**A.    Sufficient evidence existed that Defendant acted with a deliberate intent to kill when he fired his shotgun directly at Victim and Aldaba.**

{13}    Defendant argues that his conviction should be reversed because there was insufficient evidence to support his conviction of first-degree murder and attempted murder.  Specifically, Defendant asserts that the State did not provide evidence that he deliberately intended to kill Victim and Aldaba.  Instead, Defendant argues that the

6

killing was "rash and impulsive" because he was unaware people were in the car when he fired his gun. The State counters that when Defendant shot directly into a parked vehicle with defenseless victims and then walked around to the driver's side, fired a second shot and killed Victim, Defendant acted with a deliberate intent to kill.

**{14}** First-degree murder requires a "willful, deliberate and premeditated" intention to kill. NMSA 1978, § 30-2-1(A) (1994). Deliberate is defined as "arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." UJI 14-201 NMRA. Deliberate intent may be "arrived at in a short period of time." *Id.* When deciding whether the defendant made a calculated judgment to kill, "the jury may infer [deliberate] intent from circumstantial evidence." *State v. Largo*, 2012-NMSC-015, ¶ 31, 278 P.3d 532. Intent "is subjective and is almost always inferred from other facts in the case," therefore direct evidence of a defendant's intent is not required. *State v. Duran,* 2006-NMSC-035, ¶¶ 7-8, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). We have previously emphasized that circumstantial evidence alone can amount to substantial evidence. *State v. Flores*, 2010-NMSC-002, ¶ 19, 147 N.M. 542, 226 P.3d 641.

**{15}** In this case, the jury was instructed that in order to find Defendant guilty of first-degree murder, the State needed to prove beyond a reasonable doubt that:

　　　　1. The [D]efendant killed [Victim];

2. The killing was with the deliberate intention to take away the life of [Victim] or any other human being;

3. [D]efendant was not intoxicated from the use of alcohol or suffering from a mental disease or disorder at the time the offense was committed to the extent of being incapable of forming an intent to take away the life of another.

{16} The jury was also instructed on deliberate intent:

A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. . . . A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

These jury instructions reflect the distinction in our case law between deliberate first-degree murder and a "mere unconsidered and rash impulse" killing.

{17} Defendant asserts that his actions are similar to those of the defendant in *State v. Garcia,* 114 N.M. 269, 837 P.2d 862 (1992). Defendant claims that he intended to use the shotgun on himself but instead fired two shots at the Victim's vehicle without thinking and without realizing people were in the car. Defendant asserts that this evidence, which was presented at trial, is consistent with a rash and impulsive killing, not a deliberate murder.

{18} In *Garcia*, we held that where there is no evidence of deliberate intent, either direct or circumstantial, then the evidence is consistent with a rash and impulsive

8

killing. *Id.* at 274-75, 837 P.2d at 862. In *Garcia*, the defendant and victim were fighting in the yard of a home, reconciled and then began fighting again. *Id.* at 270, 837 P.2d at 863. During the second fight, the defendant stabbed the victim multiple times and killed him. *Id.* While it may have been possible for the defendant to form a deliberate intent to kill the victim in the ten to fifteen minutes between the fights, the state did not present any evidence of such intent. We held that it was impossible for the jury to have determined that the defendant formed the requisite intent for first-degree murder. *Id.* at 275, 837 P.2d at 868.

{19} Defendant also likens his actions to the defendant's actions in *State v. Adonis*, 2008-NMSC-059, 145 N.M. 102, 194 P.3d 717. In that case we again evaluated whether there was sufficient evidence to support a finding that defendant acted with deliberate intent. *Id.* In *Adonis*, we held that defendant's actions of exiting an apartment with a gun and then subsequently firing multiple shots and killing the victim, without any other evidence of deliberation, was insufficient to prove deliberate intent. *Id.* ¶ 20. Even though the state proposed theories as to the defendant's possible state of mind that *could have* constituted deliberate intent, we rejected those theories as mere conjecture, noting that they did not tend to show that the defendant *actually* formulated deliberate intent. *Id.* ¶ 21.

{20} Alternatively, the State contends that several of Defendant's actions raise a reasonable inference of deliberate intent. First, the State asserts that this Court has

looked to the defenselessness of the victim as a factor indicating deliberate intent. The State argues that Victim and Aldaba were both completely defenseless because they were unarmed and sitting in a parked car when Defendant fired at them. Second, the State asserts that evidence of planning can indicate deliberate intent which was demonstrated here by Defendant's actions on the day of the murder-Defendant borrowed a shot gun from his son, practiced shooting it, bought ammunition that would cause the most damage and modified the gun to increase the number of rounds it would shoot before reloading. Finally, the State argues that Defendant's actions exhibited a motive to kill, yet another indication of deliberate intent. Relying on Defendant's admission to Dr. Siegel, the State asserts that Defendant's desire to kill himself or provoke the police to kill him constituted the requisite intent for first-degree murder. Thus, according to the State, the facts as a whole allowed the jury to determine that Defendant's actions constituted deliberate first-degree murder and attempted murder. We agree.

{21} Our precedent distinguishes cases like *Garcia* where there was no evidence of deliberate intent presented, from cases where at least some evidence of deliberate intent existed. For instance, our cases have held that deliberate intent can be formed during the commission of a crime. In *State v. Sosa*, the victim was unarmed and attempting to escape from the defendant when he was shot in the face on his own front porch. 2000-NMSC-036, ¶ 13, 129 N.M. 767, 14 P.3d 32. Although the defendant

10

argued that he did not have enough time to form the requisite intent between shots, we rejected that contention, affirming the state's assertion that a shooter can form the requisite intent in a short period of time. *Id. ¶* 12. We held that because the defendant continued to fire at a defenseless victim the jury was able to infer deliberate intent to kill, supporting a conviction for first-degree murder. *Id. ¶* 13. In *State v. Salazar*, we again held that evidence of deliberate intent existed despite defendant's arguments that he was unable to form intent due to his consumption of drugs and lack of time to form the requisite intent during the commission of the crime. 1997-NMSC-044, ¶ 46, 123 N.M. 778, 945 P.2d 996. This Court found that the defendant's act of pointing a gun directly at the victim, who was unarmed, and then firing at her through the car window, provided sufficient direct evidence of deliberate intent. *Id.*

{22}     A defendant's acts before and after the crime may also provide evidence of intent. *See State v. Flores*, 2010-NMSC-002, ¶ 23, 147 N.M. 542, 226 P.3d 641. For example, in *State v. Flores,* we held that when the defendant brought a "screwdriver with him . . . for no other discernable purpose than to use it as a weapon" and "immediately and calmly walked away from [the victim's] bleeding body," the defendant's actions provided evidence of a deliberate intent to kill. *Id. ¶* 22. In *State v. Begay,* the defendant spoke frequently of "pulling a fatality" and carried a knife with him the night he killed an intoxicated victim. 1998-NMSC-029, ¶ 45, 125 N.M. 541, 964 P.2d 102. We determined that the defendant's desire to kill prior to the

11

murder and intentionally arming himself with a knife before leaving his friend's house provided sufficient circumstantial evidence of a deliberate intent to kill. *Id.*

{23} More recently, we have acknowledged that the emotional state of a defendant may indicate a deliberate intent to kill. *State v. Riley*, 2010-NMSC-005, ¶¶ 19, 21, 147 N.M. 557, 226 P.3d 656. In *Riley*, the defendant, upset and depressed about the end of his six year long relationship with his girlfriend, confronted his ex-girlfriend's new boyfriend during a chance encounter in a parking lot. *Id.* ¶ 5. The defendant shot the boyfriend, who was sitting in the passenger seat of a car, two times at point blank range and then once more when the boyfriend attempted to flee. *Id.* ¶ 14. We held that evidence of the defendant's emotional state prior to the murder and the fact that the defendant shot the victim at point blank range was sufficient to prove the defendant had formed the deliberate intent to kill, supporting a conviction of first-degree murder. *Id.* ¶ 21. Evidence of the defendant's emotional state in *Riley* allowed us to distinguish those facts from *Garcia*, where no evidence of the defendant's state of mind was introduced. *Id.* ¶ 19.

{24} We agree with the State's contention that all of Defendant's actions taken in concert demonstrate that he acted with deliberate intent. Specifically, Defendant's actions exhibited a motive to kill, planning and involvement of defenseless victims-all indicators of deliberate intent. We are unpersuaded by Defendant's main argument that his actions are similar to those of the defendant's actions in *Garcia*. In this case,

12

the jury was provided with evidence of Defendant's emotional state. Both psychologists agreed that due to the multiple deaths of family members in a close period of time, Defendant was in an unstable emotional state and depressed at the time he killed Victim. Defendant expressed a desire to take his own life that night and later admitted his goal may have been suicide by cop.

{25}     Evidence of Defendant's planning prior to the shooting supports a reasonable inference of a deliberate intent to kill. Defendant borrowed the shotgun from his son that day, purchased ammunition that would do the most damage, practiced shooting it, and modified the gun so he could fire more ammunition without reloading. Defendant then left his apartment that night with the loaded shotgun for no other discernable purpose than to use it as a weapon. As he walked out the door, Defendant revealed his motive, announcing to his girlfriend that he was leaving to go kill himself - again evidencing a deliberate intent to kill.

{26}     Defendant's actions during the commission of the crime further support a finding of deliberate intent. The record is clear that Defendant walked directly up to Victim's car, aimed and fired at the windshield. When he missed, Defendant walked directly to the driver's window, cocked and reloaded his gun, aimed and fired a bullet directly into Victim's head. Victim and Aldaba were unarmed and unable to flee the vehicle.

**{27}** Defendant's actions after the shooting further suggest that he was able to form specific intent. Specifically, Defendant calmly walked into the Shell store and demanded a bottle of vodka from Slee. Once the police arrived, Defendant rationally and coherently responded to their questions. Despite Defendant's contention that he was too intoxicated to form intent or realize his actions, there is no evidence on the record to support that argument. Instead, none of the responding officers noted any signs of intoxication except that Defendant had a few sips of vodka from the bottle in the store. The jury was specifically provided with an instruction regarding Defendant's intoxication in which it found Defendant was not intoxicated to the extent that he was unable to form specific intent. Further, Defendant initially lied about his motive for killing Victim because he believed it would help his defense, which a reasonable jury could have used as a basis for disregarding Defendant's claim that he was unaware that people were in the vehicle.

**{28}** It is clear from our case law that Defendant's actions exhibit many of the factors we have previously held may indicate a deliberate intent to kill. When viewing the evidence in a light most favorable to the jury's verdict, we conclude that there was sufficient evidence of Defendant's deliberate intent to kill to support a conviction of first-degree murder and attempted murder. We therefore affirm the trial court's convictions.

14

**B.**   **Sufficient evidence existed that Defendant extorted Slee when he threatened her with a loaded shotgun and demanded she get him a bottle of vodka.**

{29}   Defendant asserts that there was insufficient evidence to support his extortion conviction. Extortion is "the communication or transmission of any threat to another by any means whatsoever with intent thereby to wrongfully obtain anything of value." NMSA 1978, § 30-16-9 (1963).  The crime of extortion "is complete when a person makes a threat, intending to compel the victim to do something he [or she] would not have [otherwise] done." *State v. Wheeler*, 95 N.M. 378, 381, 622 P.2d 283, 286 (Ct. App. 1980) (citation omitted).  The broad statutory language allows for the communicated threat to be verbal, written, or even communicated through a person's actions. *State v. Barber*, 93 N.M. 782, 785, 606 P.2d 192, 195 (Ct. App. 1979).

{30}   Defendant argues because he "requested" that Slee hand him a bottle of vodka, there was no threat of particular harm to Slee. Slee testified that because Defendant was holding a weapon she felt she had no choice but to comply with Defendant's request for vodka.  Slee further testified that she felt she could not act without Defendant's permission because he was carrying the shotgun.

{31}   Viewing the evidence in a light most favorable to the trial court's finding, we hold that sufficient evidence existed for the jury to find Defendant guilty of extortion. Defendant had just fired two shots in the parking lot, killing one person, and then walked into the convenience store with a loaded shotgun. Defendant continued to hold

15

the gun while he asked Slee to get him a bottle of vodka. Slee's testimony that she felt she did not have any other choice is sufficient evidence that she would not have retrieved the vodka without the threat from Defendant.

**C.     Defendant's threat to shoot down the door if the Clerks did not open it, while holding a loaded shotgun, constituted sufficient evidence to support his convictions for aggravated assault**.

{32}     The jury was instructed that in order to find Defendant guilty of aggravated assault by use of a deadly weapon, the State needed to prove beyond a reasonable doubt that:

> 1. The defendant entered a convenience store immediately after firing a shotgun into the vehicle of [Victim] carrying the shotgun in a ready position or threatened to fire a shotgun through a door if [Clerks] did not come out;
> 2. The defendant's conduct caused Charlene McNutt to believe the defendant was about to intrude on Charlene McNutt's bodily integrity or personal safety by touching or applying force to Charlene McNutt in a rude, insolent or angry manner;
> 3. A reasonable person in the same circumstances as Charlene McNutt would have had the same belief;
> 4. The defendant used a shotgun[.]

{33}     Defendant asserts that there was insufficient evidence to support convictions for two counts of aggravated assault on two theories: first, Defendant did not directly interact with either clerk because they fled to the back of the store before Defendant entered; and second, because the second clerk did not testify at trial, the jury could not

16

have found beyond a reasonable doubt that the second clerk was in fear of an impending battery.

{34} In the context of this case, assault consists of either "an attempt to commit a battery upon the person of another" or "any unlawful act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery." NMSA 1978, § 30-3-1(A)(B) (1963). An assault is an aggravated assault if it is committed with a deadly weapon. *See* § 30-3-2(A) (1963). A jury may reasonably infer a victim's fear of immediate battery or threat to personal safety from a defendant's aggressive conduct. *State v. Ford*, 2007-NMCA-052, ¶ 29, 141 N.M. 512, 157 P.3d 77. The testimony of a single witness may be sufficient to support a jury's verdict. *State v. Hamilton*, 2000-NMCA-063, ¶ 20, 129 N.M. 321, 6 P.3d 1043 (citations omitted).

{35} At trial, one of the clerks, Armendariz, testified that he and the other clerk, McNutt, were preparing for closing when Armendariz noticed a car pull up to one of the gas pumps outside. Armendariz testified he then heard a "gunshot, a loud bang" and looked outside again. Armendariz witnessed Defendant walk from the front of the vehicle to the driver's side and fire another gunshot. Armendariz further testified that after witnessing Defendant fire the gun into the driver's side window of the car, he and McNutt ran to the back office. Armendariz stated that he "wasn't going to take the chance of [Defendant] maybe possibly coming in the store and doing the same. So

17

[he and McNutt] ran into the office, locked it up and started pushing the panic buttons." Armendariz testified that once he and McNutt were locked in the back office, McNutt called the police and they watched security video of what was happening in the store. The Clerks heard Defendant enter the store. Armendariz stated that Slee knocked on the office door and Defendant told the Clerks to come outside. Defendant warned that if they did not, he would shoot down the door.

{36} Armendariz testified that Defendant's statement made him and McNutt feel "[v]ery threatened," but that at the same time the door was a "big metal door. After Armendariz informed Defendant that he would not open the door, Slee began pleading with him to open the door. Armendariz testified that he again refused to open the door out of fear that Defendant would shoot someone else. When Slee asked that the door be opened a third time, Armendariz allowed Slee to enter the office. Armendariz testified that he opened the door because it appeared to be a life or death situation for Slee and that he could not live with himself if he did not let her into the office. The second clerk, McNutt, did not testify at trial.

{37} Armendariz's testimony alone provided sufficient evidence to support a conviction of aggravated assault. Armendariz testified that both he and McNutt saw Defendant fire the gun into the car and then head into the store. Both Clerks feared for their lives causing them to run to the back of the store and lock themselves in a room. The record shows that both Clerks could hear Defendant and watch him via video

surveillance throughout the entire event. It is undisputed that Defendant possessed a loaded shotgun when he threatened the Clerks. Armendariz testified that he refused to open the door because he feared he would be shot by Defendant. Just Armendariz's testimony is sufficient to show both clerks feared an immediate battery. When viewing the evidence in a light most favorable to the verdict, we hold that sufficient evidence existed for the jury to find Defendant guilty of aggravated assault. We therefore affirm the conviction.

**CONCLUSION**

{38}     We hold that there was sufficient evidence to support Defendant's convictions of first-degree murder, attempted murder, extortion, and aggravated assault.

{39}     Accordingly, we affirm the Defendant's convictions.

{40}     **IT IS SO ORDERED.**


_____

**PETRA JIMENEZ MAES, Chief Justice**

**WE CONCUR:**


_____

**RICHARD C. BOSSON, Justice**

19

_____

**EDWARD L. CHÁVEZ, Justice**

_____

**CHARLES W. DANIELS, Justice**

_____

**BARBARA J. VIGIL, Justice**