This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Filing Date: January 25, 2018**

**NO. S-1-SC-36031**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**ENRIQUE CARMONA,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
Gary L. Clingman, District Judge

Templeman & Crutchfield
C. Barry Crutchfield
Lovington, NM

for Appellant

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**VIGIL, Justice.**

## I.    INTRODUCTION

{1}    In this case we return to the dividing line between first- and second-degree murder, where the killer is alleged to have formed the intent to kill in a matter of seconds. *See, e.g.*, *State v. Tafoya*, 2012-NMSC-030, ¶¶ 41-43, 285 P.3d 604. Defendant Enrique Carmona shot and killed Jose Meza in the aftermath of a fight. Carmona was convicted of first-degree, deliberate intent murder, contrary to NMSA 1978, Section 30-2-1(A) (1994). Carmona appeals pursuant to Rule 12-102(A)(1) NMRA.

{2}    We consider whether the State presented adequate evidence in support of its theory that the killing was deliberate, and conclude that the evidence was insufficient to support a finding of deliberate intent. However, there was sufficient evidence to support a conviction of second-degree murder. *See Tafoya*, 2012-NMSC-030, ¶ 41 (noting that "rash and impulsive" killings are more likely to constitute second-degree murder). We therefore vacate the first-degree murder conviction for lack of sufficient evidence, and instead enter a conviction of second-degree murder. Because the issues are well-settled under New Mexico law, we dispose of the case by non-precedential

2

decision. Rule 12-405(B)(1) NMRA.

## II.    BACKGROUND

{3}    Defendant Enrique Carmona (Carmona) shot and killed Jose Meza (Victim) after a fistfight. On the afternoon of May 18, 2014, Carmona and several friends were visiting outside the home of Antonio Vargas (Mr. Vargas). The friends were drinking, and there were beer bottles strewn about the front yard. Victim and his girlfriend, Stacy Hunt (Girlfriend), lived next door to Mr. Vargas. Mr. Vargas had never met or had trouble with Victim.

{4}    Mid-afternoon, a police officer responded to a domestic disturbance at Victim's home. Victim and Girlfriend had argued, and Girlfriend had gone for a walk to "cool off." The police officer testified that it was obvious that Victim did not want him there, but left without speaking to Girlfriend. The police officer observed Mr. Vargas and his friends in the neighboring yard, but did not speak to them. Everything seemed to be "fine."

{5}    Around 5:00 p.m., Victim came out of the house clad only in boxer shorts. Victim was pacing and acting strangely. At that point—for reasons that are unclear from the record—Victim began shouting at Mr. Vargas and his friends. Mr. Vargas did not know what Victim shouted because Mr. Vargas does not understand English.

3

Girlfriend testified that someone in Mr. Vargas's yard shouted, "Diablo," which Mr. Vargas denied. Mr. Vargas testified that Victim came over for "absolutely no reason."

{6}    It is undisputed that Victim approached Mr. Vargas, punched him in the face, and knocked him off his chair. A scuffle ensued. Victim's brother, Omar Meza (Brother), who lived on the other side of Victim, heard the commotion and ran to defend Victim. The brothers tackled "the biggest guy," later identified as Mr. Vargas's friend Benito Marquez (Benito), hitting him in the nose and the eye. There was conflicting testimony as to whether Carmona joined in. Carmona claimed that the brothers came after him after they attacked Benito. Benito also testified that he saw Victim and Brother approaching Carmona. According to Brother, however, Carmona was not involved in the fight.

{7}    Mr. Vargas testified that he was on the ground for around fifteen seconds. Girlfriend thought the fight lasted about two minutes. Benito helped Mr. Vargas off the ground and the two retreated into Mr. Vargas's home to wash off the blood. Mr. Vargas speculated that the brothers continued the attack on Carmona after he went inside, but according to Brother, "the fight was over." Nonetheless, Brother armed himself with a beer bottle "in case somebody tried to run at [him] or something." Victim retrieved a beer bottle as well. Brother testified that neither he nor Victim

4

threatened Carmona with a beer bottle. Girlfriend later testified that Victim had turned and begun to walk toward her, and was holding the bottle at his side.

{8}     Victim turned to face Carmona, and Carmona pulled a gun from his pocket. Carmona moved the gun from one hand to the other, looked at Victim for about five seconds, "thought about it," and shot Victim in the head. Carmona turned the gun on Brother. Brother started running away, and Carmona shot at him twice.

{9}     Carmona left the scene and turned himself in to the police. In a police interview, Carmona stated that Victim had started the fight. Carmona admitted to shooting Victim but claimed that Victim was about to hit him with a bottle and he had a right to defend himself. Carmona stated that he did not know Victim, but that Victim would periodically harass Mr. Vargas and his friends because they were from Mexico, and that Mr. Vargas did not stand up for himself because he rented his home from Victim's relatives. Carmona said that neither brother had hit him with a bottle, but that they would have had he given them the chance. Carmona also admitted to shooting at Brother because he was angry about the attack.

{10}     Victim died at the scene. An autopsy and toxicology examination found that Victim had bruised knuckles and alcohol, marijuana, and methamphetamine in his bloodstream when he died. The police also recovered a methamphetamine pipe in Mr.

Vargas's yard. A pair of eyeglasses was also discovered at the scene, alleged but never determined to be Carmona's. Girlfriend later testified that Victim had a 40-oz bottle of beer on the afternoon of the shooting and smoked methamphetamine the night before.

{11} At trial, Carmona argued that the killing was in self-defense and that Victim initiated the attack under the influence of alcohol and drugs. The State presented the theory that the killing was deliberate and Carmona unremorseful. It did not explain Carmona's statements that Victim had previously harassed Mr. Vargas, instead proposing that the killing followed a random altercation, in accordance with the weight of the evidence.

{12} The jury was instructed on first-degree murder, second-degree murder, voluntary manslaughter, sufficient provocation, and self-defense, and returned a verdict of first-degree, deliberate intent murder. Carmona appeals the conviction pursuant to Rule 12-102(A)(1). We have jurisdiction over this capital appeal under Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A)(1).

## III.  DISCUSSION

{13} On appeal, Carmona contends that (1) the State failed to prove deliberate intent because the killing occurred in a matter of seconds; (2) the killing was in self-defense;

6

and (3) the evidence supports a verdict of voluntary manslaughter. We conclude that the evidence was insufficient to support a finding that the killing was deliberate and reject Carmona's remaining arguments.

**A.     Standard of Review**

{14}     "In reviewing whether there was sufficient evidence to support a conviction, we resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence . . . to the contrary." *State v. Largo*, 2012-NMSC-015, ¶ 30, 278 P.3d 532 (internal quotation marks and citation omitted) "[O]ur review never serves as a substitution for the jury's fact-finding role." *Tafoya*, 2012-NMSC-030, ¶ 36. "It is our duty," however, "to determine whether any rational jury could have found the essential facts to establish each element of the crime beyond a reasonable doubt." *State v. Consaul*, 2014-NMSC-030, ¶ 42, 332 P.3d 850 (internal quotation marks and citation omitted).

**B.     Evidence of Deliberate Intent**

{15}     Deliberate intent is the dividing line between first- and second-degree murder in New Mexico. *See* § 30-2-1; Leo M. Romero, *A Critique of the Willful, Deliberate, and Premeditated Formula for Distinguishing Between First and Second Degree Murder in New Mexico*, 18 N.M. L. Rev. 73, 74, 83 (1988). In order to prove that a

7

defendant committed willful and deliberate murder in the first degree, the State must prove that the accused had the deliberate intent to take away the life of another. *State v. Garcia*, 1992-NMSC-048, ¶ 17, 114 N.M. 269, 837 P.2d 862. The uniform jury instruction defines "deliberate intent" as:

> [A]rrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intent to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

UJI 14-201 NMRA. While an intentional killing may support a conviction of first-degree murder, second-degree murder, or voluntary manslaughter, first-degree murder is differentiated by the element of deliberate intent. *State v. Adonis*, 2008-NMSC-059, ¶ 14, 145 N.M. 102, 194 P.3d 717; *see also* Romero, *supra*, at 77. We have long held that a killing that is not deliberate, but intentional and without justification or provocation, supports a verdict of second-degree murder. *Tafoya*, 2012-NMSC-030, ¶ 37.

{16} Deliberate intent is rarely proven through direct evidence and often inferred from the facts and circumstances surrounding a killing. *State v. Flores*, 2010-NMSC-002, ¶ 19, 147 N.M. 542, 226 P.3d 641. We have upheld jury findings of deliberate

intent in cases involving a range of circumstances. *Id.* Evidence of deliberate intent can include a large number of wounds, a prolonged struggle, the defendant's attitude toward the victim, and the defendant's interaction with police. *Id.* ¶¶ 21-22. For example, we upheld the jury finding of deliberate intent where the defendant stabbed his former lover twenty-one times with a screwdriver. *Id.* ¶ 1. The finding was supported by evidence of motive, plan, stalking, lying in wait, overkill, that the defendant carried the screwdriver for no purpose but to use it as a weapon, destroyed the evidence, fled the scene, and attempted to deceive the police. *Id.* ¶ 22.

{17} In other cases, it was less obvious that the killing was deliberate. *See, e.g.*, *Adonis*, 2008-NMSC-059, ¶ 13 (a split decision noting that "the distinction between first-degree and second-degree murder is not always clearly or, for that matter, easily articulated"). Cases and commentary establish that deliberate intent is not a fail-safe metric for distinguishing the most reprehensible killings. Romero, *supra*, at 93. Due to the vagueness of the term, almost all cases alleging an intentional killing warrant an instruction on deliberate intent, and "[p]roof of an intentional killing in the absence of diminished capacity seems to warrant an instruction on and to support a conviction of deliberate murder in all cases." *Id.* at 83-84, 86. Previously, the case law "belie[d] the premise that the definition of deliberate intention in New Mexico law is clear

9

enough to demarcate deliberate killings from rash or impulsive intentional killings." *Id.* at 85. "Virtually all intentional homicides support[ed] a first-degree murder instruction and verdict." *Id.* at 91.

{18} Despite the lack of clarity in the current homicide statute, the Legislature did not intend to punish all intentional killings, including those which are intentional but non-deliberate, to the fullest extent of the first-degree murder statute. *Garcia*, 1992-NMSC-048, ¶ 19. Correspondingly, we have on several occasions overturned jury findings of deliberate intent and instead held that the evidence was consistent with second-degree murder. *See, e.g.*, *id.* ¶ 28. These cases impose several limitations on the breadth of the first-degree murder statute.

{19} In *Garcia*, we clarified that the first-degree murder statute excludes non-deliberate, "rash and impulsive" murders. 1992-NMSC-048, ¶ 22. The defendant was convicted of first-degree murder for stabbing a victim in a drunken fight. *Id.* ¶¶ 3, 4, 9. With respect to deliberate intent, the State presented evidence that the defendant had quarreled with the victim, made up, quarreled again, "trad[ed] punches" and shoved the victim against the wall before stabbing him in the chest. *Id.* ¶ 28. There was also evidence that an onlooker predicted that "[there would] be trouble," and that the defendant at one point asked for the victim to be removed from his presence. *Id.*

¶¶ 5-6. Despite ample evidence that the killing was intentional, none tended to prove that the defendant engaged in the "careful thought" necessary to support a finding that the killing was deliberate. *Id.* ¶¶ 28, 30. We vacated the conviction of first-degree murder and instead held that the evidence was consistent with second-degree murder. *Id.* ¶¶ 28, 33.

{20} We next clarified that a killing that occurred within a short period of time is more likely to support a verdict of second-degree murder than deliberate intent. *Tafoya*, 2012-NMSC-030, ¶ 41 ("[R]ash and impulsive killings are far more likely to be the product of an expedited decision-making process than are carefully contemplated killings."). In *Tafoya*, the defendant was convicted of attempted first-degree murder based on evidence that he was in the back seat of a car, drinking and high, when the car stalled and he shot into the front seat, killing the driver and injuring the passenger. *Id.* ¶¶ 1, 6-7, 46. At issue was whether there was sufficient evidence to prove that the defendant had the deliberate intent to support his conviction of attempted first-degree murder with respect to the passenger. *Id.* ¶ 52. The only evidence of deliberate intent was the passage of a second or two between the shootings. *Id.* We rejected the contention that the fact that the defendant had time to deliberate was enough to support a finding of deliberate intent, and remanded for an

11

entry of judgment of attempted second-degree murder. *Id.* ¶ 55. While a defendant can conceivably form the deliberate intent to kill in a short period of time, the State may not rely solely on this possibility to prove deliberate intent. *Id.* ¶ 42.

**{21}** When a defendant is alleged to have formed the deliberate intent to kill within a short period of time, the State must provide "other" evidence of deliberate intent.[1] *Id.* ¶ 42 ("[I]t is possible in certain cases for a jury to reasonably infer . . . that the deliberative process occurred within a short period of time—the crucial element being the presentation of other evidence." (emphasis omitted)). "Cases that have affirmed first degree murder convictions where the killings occurred within a short period of time have relied on evidence beyond the temporal aspect of the crime in order to find sufficient evidence of deliberation." *Id.* (alteration omitted) (citing *State v. Blea*, 1984-NMSC-055, ¶¶ 1-4, 101 N.M. 323, 681 P.2d 1100). For example, the jury could have

---

[1]*See Garcia*, 1992-NMSC-048, ¶ 30 (noting that if "a defendant can form the requisite intent for first degree murder in a short period of time . . . it is hard to see any principled distinction between an impulsive killing and one that is deliberate and premeditated" (citations omitted)); *see also State v. Gonzales*, No. 35,291, dec. ¶ 16 (N.M. Sup. Ct. Feb. 11, 2016) (non-precedential) ("The juxtaposition of deliberation and short time frame . . . is hard to reconcile."); Romero, *supra* at 87 (suggesting the "if deliberation is to be the basis for distinguishing between first and second degree murder . . . the jury instruction should define deliberation so as to include sufficient time for the careful thought and weighing of the considerations for and against the killing").

reasonably found that a defendant had the deliberate intent to kill when he shot two people in short order in *Blea*, 1984-NMSC-055, ¶ 2. In addition to "temporal" evidence, the State presented evidence that the defendant shot one victim, turned and shot the second victim, and chased the first victim into an alley before returning to shoot the second victim again. *See id.*

{22}    In *Gonzales*, we upheld a finding of deliberate intent where the defendant shot the victim after a fistfight. No. 35,291, dec. ¶¶ 11, 3-4. In that case, the defendant went to the scene, uninvited and "as if he was looking for a fight." *Id.* ¶ 22. He immediately engaged the Victim in a verbal altercation, handed a gun to his girlfriend, and started a physical fight. *Id.* ¶¶ 3, 4. When it became apparent that he was losing the fight, the defendant calmly walked over to his girlfriend, retrieved the gun, loaded it, and shot the victim in the head. *Id.* ¶¶ 4, 23. There was also testimony that the defendant's family had a history of conflict with the victim. *Id.* ¶¶ 7-8. In affirming the first-degree murder conviction, we expressly noted that the defendant did not act rashly and impulsively. *Id.* ¶ 11.

{23}    A defendant may be unable to form the deliberate intent to kill because he is in some way limited in his capacity to form deliberate intent. *See State v. Balderama*, 2004-NMSC-008, ¶ 45, 135 N.M. 329, 88 P.3d 845 (concluding that the district

13

court's exclusion of evidence regarding the defendant's neurological deficits was not harmless); *see also* Romero, *supra*, at 89 (stating that "inability to form a deliberate intention to kill another operates as a defense to first degree deliberate murder"). In both *Garcia* and *Tafoya*, the shootings were committed under the influence of alcohol or drugs. *Garcia*, 1992-NMSC-048, ¶ 4; *Tafoya*, 2012-NMSC-030, ¶ 5. In *Adonis*, the defendant suffered from paranoid schizophrenia. 2008-NMSC-059, ¶ 2. The defendant faced criminal commitment for shooting someone who parked in his parking place. *Id.* ¶¶ 3-4. The only evidence of deliberation was the defendant's post-killing statement that "that will teach [the victim] not to park in my place."[2] *Id.* ¶ 30. We concluded that this was insufficient to prove that the killing was committed with deliberate intent. *Id.* ¶ 1.

{24}     Guided by this precedent, we consider whether the evidence supports a finding that Carmona not only intended to kill Victim, but did so with deliberate intent. The State contends that the killing was deliberate, as opposed to "rash and impulsive," because Carmona:

---

[2]The majority noted that there was no evidence that the defendant was "lying in wait." *Adonis*, 2008-NMSC-059, ¶ 24; *see also id.* ¶ 32 (Chávez, J., dissenting) (stating that a jury could have reasonably inferred that the defendant was, in fact, " '[l]ying in wait' ").

- Removed the gun from his pocket with his left hand;
- Changed hands;
- Cocked the gun;
- Put the gun near Victim's left temple;
- Shot Victim.

The fact that Carmona shot Victim in the head—which he freely admitted when he turned himself in—proves that the killing was intentional. Romero, *supra*, at 77 (explaining that a killing is intentional when done "with the purpose of bringing about the result of death"). We are unpersuaded, however, that the shooting is by itself sufficient to prove that Carmona engaged in the careful thought and calculated judgment required to prove that the killing was deliberate. *See* UJI 14-201.

{25} The mere fact of the killing is not enough to infer that the killing was deliberate. Unlike cases involving prolonged injury or excessive wounds, the shooting does not prove that Carmona engaged in a sustained weighing of consequences. *See Flores*, 2010-NMSC-002, ¶ 21. The mere act of shooting is equally consistent with a non-deliberate killing. Without more, this is insufficient to prove that the killing was deliberate beyond a reasonable doubt.

{25} We have since described *Garcia* as a "high-water mark" in which the State failed to produce evidence of deliberation. *State v. Astorga*, 2015-NMSC-007, ¶ 62, 343 P.3d 1245. The instant case presents even less evidence of deliberate intent. The

15

State does not argue that Carmona had a preexisting conflict with Victim. *See Garcia* 1992-NMSC-048, ¶ 5. There was no evidence that Carmona had met, threatened, or quarreled with Victim on a prior occasion. *See id.*¶¶ 5-6. The only evidence the State points to in support of its theory that the killing was deliberate is the shooting itself.

{26}     The State does not point to Carmona's claim that the brothers had a history of harassing Mr. Vargas as evidence of deliberate intent, and did not do so at trial.[3] At trial, the State did not contend that these statements were evidence of a prior conflict and instead discredited this version of events. Absent further development, we cannot conclude that an after-the-fact justification for the shooting is enough to prove deliberate intent. *See Adonis* 2008-NMSC-059, ¶¶ 20-21 (refusing to accept the defendant's post-killing explanation for the shooting as proof of deliberate intent); *cf. State v. Gallegos*, 2011-NMSC-027, ¶ 23, 149 N.M. 704, 254 P.3d 655 (explaining that the guilty mind and act must coincide in order to establish criminal liability). This distinguishes the case from *Gonzales*, where the defendant had a history of conflict with the victim. No. 35,291, dec. ¶¶ 7-8.

---

[3]Contrary to the other testimony and his own statement that he did not know Victim, Carmona claimed in his police interview that the brothers had "gone there many times," "with guns," "[b]ecause we are from Mexico and he often beats on Mexicans."

16

**{27}** Carmona did not take the additional step of retrieving or loading the weapon before he shot, as was the case in *Gonzales*, No. 35,291, dec. ¶ 4. There was no testimony that Carmona went "looking for a fight." *See id.* ¶¶ 3, 22. It was Victim who came over, uninvited, and knocked Mr. Vargas off his chair—unlike *Gonzales*, where the defendant arrived at the scene and instigated a fight. *Id.* ¶¶ 3-4. Indeed, there was no evidence that Carmona arrived at Mr. Vargas's house prepared to engage in violence.

**{28}** Intentional, non-deliberate killings support a verdict of second-degree murder. *See Garcia*, 1992-NMSC-048, ¶ 22. The minimum intent required to support a verdict of second-degree murder is "know[ledge] that [the defendant's] acts create a strong probability of death or great bodily harm." Section 30-2-1(B). A defendant can be convicted of second-degree murder when he did not deliberate to the extent described by UJI 14-201, but nonetheless intended to bring about the result of death. Romero, *supra*, at 77.

**{29}** While there is scant evidence that the killing was deliberate, the facts do support a finding that the killing was intentional. Based on the shooting, the jury could have reasonably inferred that Carmona intended to bring about Victim's death. Carmona was clearly equipped with knowledge that the shooting would result in Victim's death,

the minimum required to support second-degree murder. Section 30-2-1(B).

{30} The instant case bears all the hallmarks of a non-deliberate, "rash and impulsive" second-degree killing. Like *Garcia*, both the defendant and the victim had been drinking all day. 1992-NMSC-048, ¶ 4. Like the shooting in *Tafoya*, the killing occurred within a short period of time. 2012-NMSC-030, ¶ 52. And like *Adonis*, the killing was an unplanned and seemingly random event. *Cf.* 2008-NMSC-059, ¶ 21. This precedent compels the conclusion that the evidence was legally insufficient to support a finding that the killing was deliberate, under any version of the facts.

{31} We conclude that the evidence was insufficient to support a verdict of first-degree murder. However, there was ample evidence to support a verdict of second-degree murder. We therefore vacate the conviction of first-degree murder and instead remand for an entry of judgment on a conviction of second-degree murder.

**C.    Carmona's Remaining Claims**

{32} Carmona also contends that the killing was in self-defense and that the evidence supports a verdict of voluntary manslaughter. These arguments rest on factual issues which were disputed at trial. We reject these arguments to the extent that Carmona asks us to substitute our view of the facts for that of the jury.

**D.    Self-Defense**

18

{33} To the extent Carmona argues that he shot Victim in self-defense, the jury was free to reject his version of the facts. *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. Carmona asserted that he shot Victim because Victim was about to hit him with a beer bottle. There was, however, conflicting testimony as to whether Carmona was involved in the fistfight that preceded the shooting. While Carmona claimed that the brothers attacked him and knocked off his glasses, Brother denied his involvement in the fistfight that preceded the shooting. According to Girlfriend, Victim was retreating from the fight when the shooting occurred. Given the conflicting testimony, a jury could have reasonably rejected the claim that the killing was in self-defense.

**E.     Voluntary Manslaughter**

{34} Carmona also contends that he is guilty of no more than voluntary manslaughter. We reject this argument. While we are unpersuaded that the killing was deliberate, neither are we convinced that it was induced by circumstances sufficient to reduce the conviction from second-degree murder to voluntary manslaughter.

{35} Our finding that the killing was intentional does not preclude a conviction of voluntary manslaughter, as voluntary manslaughter has been described as a second-degree killing with sufficient provocation. *State v. Jernigan*, 2006-NMSC-003, ¶ 18,

139 N.M. 1, 127 P.3d 537. The provocation must be sufficient to render the defendant incapable of self-control. *State v. Taylor*, 2000-NMCA-072, ¶ 27, 129 N.M. 376, 8 P.3d 863. "The provocation must be such as would . . . cause a temporary loss of self control in an ordinary person of average disposition." UJI 14-222. In this respect, the voluntary manslaughter theory is supported by Carmona's explanation for the killing: that he shot Victim because he was angry about the attack.

{36}    "The question of whether the circumstances rose to the level of provocation to reduce second degree murder to voluntary manslaughter was for the fact finder to resolve." *Id.* ¶ 28. The jury could have reasonably determined that the circumstances would not have provoked the same response in an ordinary person, as there was conflicting evidence as to who initiated the attack. We conclude that a jury could have reasonably rejected a provocation theory based on the evidence presented.

{37}    Carmona does not point to specific evidence of provocation, and instead relies on a theory that the killing was committed in imperfect self-defense. *See State v. Henley*, 2010-NMSC-039, ¶ 24, 148 N.M. 359, 237 P.3d 103 (explaining that murder can be reduced to voluntary manslaughter when the killing is in imperfect self-defense). "Imperfect self-defense occurs when an individual uses excessive force while otherwise lawfully engaging in self-defense." *Id.* ¶ 20. Key to this determination

is a finding that the killing was justified, notwithstanding the use of excessive force. As we have explained, the jury was not obligated to accept the theory that Carmona was acting in self-defense. Thus, we reject the contention that the evidence supports a conviction of voluntary manslaughter.

## IV.    CONCLUSION

{38}    We vacate Carmona's conviction of first-degree, deliberate intent murder for lack of sufficient evidence and remand for an entry of judgment on a conviction of second-degree murder.

{39}    **IT IS SO ORDERED.**


_____
**BARBARA J. VIGIL, Justice**


**WE CONCUR:**


_____
**JUDITH K. NAKAMURA, Chief Justice**


_____
**PETRA JIMENEZ MAES, Justice**

_____

**EDWARD L. CHÁVEZ, Justice**

_____

**CHARLES W. DANIELS, Justice**

22